CAROTTI ET AL. *v.* STATE, 42 Miss. R., 334.

### ADULTERY AND FORNICATION.

Criminal intercourse, once shown, is presumed, if the parties are still living under the same roof, to continue, notwithstanding those who dwell with them are not prepared to depose to the fact. The principle is specially applicable to a civil proceeding for a divorce.

In order to constitute the offense of adultery or fornication, under Art. 8, p. 573, of the Rev. Code, it must be shown that the parties dwell together openly and notoriously,

as if the conjugal relation existed between them.  13 Illinois, 597; 12 Iowa, 499; 3 Dev. & Batt., 110 ; 5 Blackford, 358 ; 10 Mass., 153.

C. and W. were indicted for unlawful cohabitation.  The testimony showed that they lived together under the same roof as master and servant, and that there were occasional instances of illicit intercourse between them.  *Held*—That under the statute the testimony was not sufficient to warrant a conviction.

Adultery and fornication are not indictable at common law unless committed openly and publicly, as in a street or highway.

Error to the circuit court of Marshall county.  CLAYTON, J.

The opinion of the court contains a statement of the case.

*Featherston, Harris & Watson,* for plaintiffs in error.

Under the statute, Art. 8, Rev. Code, 573–4, the plaintiffs in error were tried and convicted.  The phraseology of the act is too plain to admit of a doubt.  The court below seemed to concur with us in this charge: " That occasional instances of sexual intercourse, even if the jury from the evidence believe that such did occur, are not sufficient to justify a verdict of condemnation.  To warrant a conviction, the jury must believe from the evidence that the defendants did *live together* in unlawful cohabitation."  This charge was clearly correct.

Unless there is *living* together, there is no offense under the law.  Living together does not mean an association of a few minutes, however close and intimate.

A man and his wife are said to live together; but the expression has never been employed to denote the relations existing between a *roué* and his concubine, however frequent may have been their meetings, or however protracted and thrilling may have been their interviews.  Unless they *lived* together, not for a few moments, or for a few hours only, but habitually, they could not possibly be embraced in the usual and legitimate meaning of the expression, " living together."  The above statute embraces the two distinct offenses of *adultery* and *fornication*.  The latter, at common law, was only a misdemeanor, but unless it partook of the nature of public and offensive lewdness, it was not in itself indictable.  Whar. Am. Crim. Law, 760.  Fornication and lewdness are almost convertible terms.

In the case of Brooks v. The State of Tennessee, 2 Yerg., 482, where a party was indicted for lewdness, not under any statute of the state, but under the common law, the court said: ".The

offense must be open and notorious. If he did not commit the indecency alleged in *the public view*, he was guilty of no offense for which the public in its corporate capacity could punish him by indictment for a public nuisance."

Yet if the public be not involved, and the act, which might otherwise become criminal, is veiled in darkness or shrouded in secrecy, the law does not nor cannot undertake its punishment. Whether adultery is an offense in this country at common law, is a matter of doubt; in some of the states it is not. Anyhow, the terms of our statute have made it an offense, and so we must deal with it. We are now considering an alleged violation of the penal laws of our state, and have nothing to do with the relation and responsibilities of the marital kind.

The law gives redress to the father or the husband for any unholy infringement upon the purity and sanctity of the fireside. One single act of illicit intercourse on the part of either the husband or wife will, in a court of conscience, release the complaining party from the bonds and obligations of matrimony. So will a single act of illicit sexual intercourse with either the wife or daughter give to the husband or father a right of action for damages against the wrongdoer. But we deny that any case can be found, either at common law or under any statute analogous in its provisions to ours, in which any single act of illicit sexual intercourse has been criminally punished.

This statute is in its nature highly penal, and must therefore be construed strictly.

There must be a *living together* in adultery or fornication before it can be urged that there has been a violation of the statute? Why is adultery punishable at all? Simply because it is an invasion of social right, and the disturbance of the course of descent; and unless, therefore, the *living together*, in adultery or fornication, becomes a matter of such publicity and notoriety as to involve the well-being of the social compact, and be offensive to public morality, it is not an act of which the commonwealth can take cognizance, but remains to be redressed as a grievance against an individual or individuals. *Vide* Wright v. State, 5 Blackf., 358.

We are told that Solomon was a great lover of women, and

that he was a "mighty man among them," insomuch that he actually had "*seven hundred wives*, princesses, and *three hundred concubines*." It is impossible that he could have lived with them all, for they were scattered among the Moabites, Ammonites, Edomites, Zidonians, and Hittites; and while he ran counter to the divine will, and incurred the displeasure of High Heaven by the extraordinary indulgence of his lusts, he is nowhere condemned for having *lived* with ten hundred women.

So now a man may travel from town to town, from city to city, from country to country, tarrying a while in each, and selecting in each some frail and fair daughter of Eve for the occasional gratification of his sensual appetites; and even though in so doing he should rival the "glory and power of Solomon," yet unless it could be shown that there was habitual, public, and notorious *living together* in unlawful cohabitation, no punishment could be inflicted, either by the common law or by any statutory regulation of which we are aware.

The court erred in refusing the fourth charge, which is as follows: "That to justify a verdict of guilty, the jury must believe from the evidence that the defendant, Mary Wilson, yielded her person, generally or habitually, to her co-defendant, for the gratification of his passions, as between husband and wife." The charge is sound law. It simply suggests a standard by which the jury could have arrived at a satisfactory solution of the term "living together," as employed in the act, and is in *direct accordance* with the opinion of Judge Gaston in the case of The State v. Curren Jolly and Elizabeth Whitely, 3 Dev. & Batt. Law Rep., p. 115.

The most that can be said from the testimony in this case against the plaintiffs in error is, that it creates a suspicion; that they had, perhaps, in one or two instances, yielded to the flesh. The statements of the witness Ormesby are clearly entitled to no respect. He is shown to be not only extremely inimical to Carotti, but is directly contradicted by several witnesses of the highest credibility. The other and only witness who "saw those things which could not be seen," stultifies himself by declaring that "he attached no importance to an oath, &c., and would swear either way for a drink or a treat." We are only

called upon to answer the charge of "*living* together in unlawful cohabitation." This has not been proved.

If the legislature contemplated the punishment of one, two, three, or a dozen acts of illicit intercourse between the sexes, why was it that language was employed so broad and comprehensive as that contained in the statute?

It is to be presumed that there was some intelligence in the body by which that statute was passed; that they were all over twenty-one years of age, and were *possessed of some experience and observation* in the "*ways of the world.*" They knew it would be extremely difficult to find the man so pure as to be able "to cast the first stone." It may be, too, the members of that body, or some of them, had either read or heard of the Bible, and knew that our Saviour, when upon earth, knew that scarcely one could be found who was wholly guiltless; for when the "Scribes and Pharisees brought unto him a woman taken in adultery," and assured him that she was taken in the very act, after some reflection, he, being omniscient, as well as omnipotent, knowing all the human heart and human conduct, said to his tempters, "He that is without sin among you, let him first cast a stone at her." They all left, not one being able to pass the ordeal.

We know that all, not even excepting the most sanctimonious "Holy Willie" in the land, have need to say:

> "But yet, O Lord, confess I must,
>   At times, I'm fash'd wi' fleshly lust;
> And sometimes, too, wi' worldly trust,
>     Vile self gets in;
> But Thou remembers we are dust,
>     Defiled in sin.

> "Besides, I farther maun allow,
>   Wi' Lizzie's lass, three times I trow—
> But, Lord, that Friday I was fou
>     When I came near her,
> Or else, Thou kens, thy servant true
>     Wad ne'er hae steer'd her."

The second charge given by the court below, on the part of the state, was erroneous. It is neither in accordance with right reason, the results of human experience, or those occurrences in the future which the past gives us just cause to anticipate. Let it be remembered that the parties charged lived in a large and

popular hotel, open to the world; and that there were other female servants there, and that thousands of visitors annually frequented it.   Among so many, Carotti might have had illicit intercourse with many or few, both white and black; and from this charge it is right to infer, that if he was culpable once, he was from that fact supposed to be necessarily guilty ever thereafter, so long as the "partner of his joys" remained under the same roof.

In an evil hour some fair one, who may be a regular boarder and inmate of the hotel, may yield her faith, and "eat the apple" so temptingly offered by a human serpent, as fully to overcome her frail powers of resistance; and yet from this charge she is forever precluded from the hope of reformation, and is compelled to find the road to repentance barred and blocked against her earnest efforts and entreaties.

*C. C. Shackleford*, for the state.

The court below was right in giving the second charge; the instruction is in the exact language of one of the greatest legal authors.   2 Greenleaf, § 43, p. 33; Turton v. Turton, Hagg. Eccl. Rep., 350.

The fourth charge for defendants was properly refused; it states no principle of law, but leaves the law to be determined by the jury.

The authority referred to to sustain the instruction, on examination, will be found inapplicable; and the term "husband and wife" is used only by way of illustration of a principle, and not as making a principle.   State v. Jolly and Whitely, 3 Dev. & Battle.

The granting of a new trial rests in the sound discretion of the court below, as held by this court (Door v. Watson, 28 Miss., 383); and this court will not interpose unless there is a clear violation of right, and the truth and justice of the case.   1 S. & M., 381.   It will not disturb the verdict, though found contrary to a portion of the evidence.   10 S. &. M., 313; 12 ib., 608; 14 ib., 624–7–8.

PEYTON, J.:

The record in this case shows that the plaintiffs in error were,

at the July special term of the circuit court of Marshall county, indicted for living together in unlawful cohabitation, from the 1st day of March to the 1st day of July, 1867, and that at the September term of the said court they were tried and convicted; that a motion was made to set aside the verdict and grant them a new trial, which was overruled by the court. To which ruling of the court the plaintiffs in error excepted, and the court then pronounced judgment upon them. And the cause comes here by writ of error.

The evidence on which the conviction was founded is substantially as follows:

Henry Ormesby, on the part of the state, testified that from the north window of the second story of his house, distant from Carotti's one hundred and twenty or thirty feet, he had seen, on several occasions, the defendants engaged in sexual intercourse, during the spring and summer of 1866; and that on Sunday, the 7th or 8th of April, 1867, witness, standing in front of his house, saw defendants, in an up-stairs room on the south side of Carotti's house, engaged in sexual intercourse; that the window was up, and witness saw the defendants thus engaged, but not so plainly as he had done on former occasions; that witness and Carotti were unfriendly, and had been so for some time. Witness kept a drinking-saloon in his house. The difference between witness and Carotti originated after the latter had opened a drinking-saloon in his hotel.

T. Dressler testified that some time in the fall of the year 1866, while working upon the said Carotti's house, he had occasion to go up-stairs in said house for some tools, where he discovered the defendants in the act of copulation.

George Chew testified that he was in the employment of defendant, Carotti, on one occasion, as a servant in his hotel, in the month of October, 1866, and about nine o'clock at night he went up-stairs to get a bed to make down for the barkeeper, and passed into said Carotti's room, where he discovered the defendants in bed together, without any light in the room.

Samuel Ellison testified that he was a servant in the hotel of said Carotti in October, 1866, and saw defendants lying, early one morning in that month, upon the same pallet in the

kitchen of said hotel, undressed and asleep, but saw nothing else.

Lewis McEwen testified that he was cook in said Carotti's hotel for several months, and had access to all parts of the house day and night, and never saw anything improper between the defendants.

S. Davidson testified that he saw defendants, one evening about dark, walking together in an alley in Holly Springs, and that he accosted said Carotti jocularly about it, when Carotti replied in the same spirit, and by implication admitted that he had criminal intercourse with his co-defendant, Mary.

John McGuirk testified, on the part of the defendants, that he was the lessee of the hotel, occupied by said Carotti, from the Miss. Cent. R. R. Co. His business called him a great deal about said hotel. Anonymous letters of a scurrilous character had been written to the authorities of said company about Carotti, which had been referred to him, as the general agent of said road, for investigation; that he had diligently investigated the charges of illicit intercourse between the defendants; had called said Carotti's attention to them, and Carotti told him that he would dismiss the said Mary from his employment, although she was a very superior servant, if he, witness, said so; and witness being fully satisfied that said charges were malicious, advised said Carotti not to dismiss said Mary, knowing her to be a very superior servant; that he had been at said hotel very often by day and by night, and had never seen any improper conduct between defendants; that he knew the locality of said hotel and witness Ormesby's house, and had taken position, with other gentlemen, in front of said Ormesby's house, with a view to ascertain if persons in the room of the hotel, where said Ormesby testified he had seen defendants in sexual intercourse, could be seen, and stated that it would be impossible; that from the height of the window-sills in said room, and an intervening brick wall left standing where the old hotel had been burnt, persons could not be seen from the front of said Ormesby's house in said room; that a person standing up in said room by the window might perhaps expose to view the head and breast from said Ormesby's house, but not the remainder of the person; that

it was 138 feet from the south side of said hotel, where said room was situated, to the north front of said Ormesby's house; that he had never been up-stairs in said Ormesby's house; that Carotti took possession of and opened said hotel on the 5th day of November, 1866.

H. E. Williams testified that he had made the same examination as the witness McGuirk, about the possibility of seeing persons in said room in said hotel from the front of said Ormesby's house, on the ground, and concurred with said McGuirk in his conclusion.

W. H. Jones testified that he was the city marshal, and had been to said Carotti's hotel repeatedly, at almost all hours, by day and by night, and that he never saw anything improper between defendants, and does not think that persons could be seen from the front of said Ormesby's house in said room of Carotti.

R. Hastings testified that he lived near the said Ormesby's house; that he never saw any impropriety between defendants; that he had a better view, from the front of his house, of said room of Carotti, than said Ormesby could have from the front of his; and that persons, either lying down or stooping in said room, could not be seen from the front of said Ormesby's house below, or of that of witness.

J. M. Spradly testified that he was a police officer of the city of Holly Springs, and had been at said Carotti's house very often, day and night, and never saw any impropriety between defendants, and knew from what he heard said Ormesby say, that he entertained very bad feelings towards said Carotti.

John Botts testified that he was at the hotel of the said Carotti, with his family, on Sunday, the 7th or 8th of April, 1867, and that he with his family occupied the said room in said hotel, and that his wife, being indisposed, was lying down in said room the whole of said day, he passing in and out of it during the day; that he had been a great deal at said hotel, and never saw anything wrong between said defendants, and that he could not see into said room from the front of said Ormesby's house below, owing to the height of the window-sill and the intervening wall.

Clarissa testified that she was in the employment of said Carotti at said hotel ever since Christmas, 1866, and had been through all parts of said hotel at nearly all hours, and never saw anything improper between said defendants. And Henry Harris testified to the same effect.

J. M. Yorrell testified, on the part of the state, that in March, 1867, about eleven o'clock at night, while waiting for the railroad train, he saw defendant, Mary, lying asleep in the dining-room of said hotel, with her head in said Carotti's lap, and lights burning in said dining-room. J. J. House thought persons might be seen in said room from the front of the said Ormesby's house, and John Dean thought that they could not, unless they were standing up.

The first error assigned is, that the court erred in giving the second charge on the part of the state, which is as follows: "Where criminal intercourse is once shown, it must be presumed, if the parties are still living under the same roof, that it still continues, notwithstanding those who dwell under the same roof are not prepared to depose to that fact."

This charge, as a general legal proposition, is correct, and is especially applicable in a civil proceeding for a divorce, where it became necessary to establish the fact of adultery. The court in such a case would certainly be authorized to draw the same conclusions which everybody else would draw from the same facts; and when it is once established that an occasional criminal intercourse has commenced between the parties, and they are found together under circumstances which would induce every unprejudiced mind to conclude their inclinations had not changed, the fair presumption would be that the same kind of intercourse still continued. But, even admitting the full force of this presumption in the case at bar, it would not establish the offense contemplated by the statute.

It is apparent from the testimony, that Carotti took possession of the hotel at Holly Springs, on the 5th of November, 1866, and opened the same on that day, and that Mary Wilson was employed by him as a domestic servant in said hotel, at the time that the offense charged in the indictment was alleged to have been committed by them.

Within the time the plaintiffs in error were charged in the indictment with living together in unlawful cohabitation, the testimony of Ormesby proves but one instance of sexual intercourse between them, and that was on the 7th or 8th day of April, 1867, in a room in the second story of Carotti's house, and stated to have been seen by the witness standing in front of his own house. And he is the only witness that testifies to this fact. Botts testifies that he and his family occupied that room of the hotel on that day, and that his wife, being indisposed, was lying down in said room during the whole of said day, and that he himself was passing in and out of it throughout the day, and saw nothing wrong between the plaintiffs in error. This testimony of Botts, and that of most of the other witnesses going to show that persons in that room could not be seen from the ground in front of said Ormesby's house, unless they were standing up, taken in connection with the fact that Ormesby entertained an unfriendly feeling towards Carotti, and with his own admission that he did not see them as plainly as he had on former occasions, furnish a good reason to doubt the correctness of his vision on that occasion. Be this, however, as it may, taking the whole testimony together, we cannot resist the conclusion that these parties have indulged, both before and since the opening of the hotel, in occasional sexual intercourse, but not under such circumstances as would make it indictable, either under the statute or at common law.

The second error assigned is, that the court erred in refusing to charge the jury, "that to justify a verdict of guilty, they must believe from the evidence that the defendant, Mary Wilson, yielded her person generally or habitually to her co-defendant, Carotti, for the gratification of his passions, as between husband and wife."

To determine the propriety of this charge, it becomes necessary to ascertain the meaning of that provision of the statute under which these parties have been prosecuted, which prohibits any man and woman from living together in unlawful cohabitation, whether the same be in adultery or fornication. Rev. Code, 573, art. 8.

We are of opinion that, in order to constitute this offense,

the parties must dwell together, openly and notoriously, upon terms as if the conjugal relation existed between them. It consists in the living together in the manner of husband and wife, without being lawfully married, in the open assumption of the visible forms and rights of matrimony, without the sanction of the nuptial tie, and without incurring those obligations and responsibilities which attach to the married state. The design of the statute was to prevent evil and indecent examples tending to corrupt the public morals, and to prohibit the public scandal and disgrace of the living together of persons of opposite sexes notoriously in illicit intimacy, which, as it contemns lawful wedlock and lessens the incentive to marriage, contravenes the public policy, and which outrages public decency, and has a demoralizing and debasing influence upon society. And where, indeed, they live together in the same family and under the same roof, in the relation of master and servant, and not as husband and wife, occasional clandestine sexual intercourse surely would not constitute the offense intended by the statute, of living together in unlawful cohabitation. Searls v. The People, 13 Illinois, 597; The State v. Marvin, 12 Iowa Rep., 499; The State v. Jolly, 3 Dev. & Batt., 110; Wright v. The State, 5 Blackford, 358; and The Commonwealth v. Calef, 10 Mass., 153. We therefore think the instruction was correct, and should have been given.

The third and last error assigned is that the court erred in refusing to set aside the verdict of the jury and grant a new trial.

It is very evident that the jury found their verdict upon a mistaken view of the law. They were, no doubt, under the impression that, as the plaintiffs in error lived together at the same hotel, although in the relation of master and servant, occasional instances of illicit intercourse, even though clandestine, would constitute the offense for which they were indicted, and they were probably aided in arriving at this conclusion by the refusal of the court to give the instruction asked on the part of the plaintiffs. The verdict was not justified by the evidence, and the court therefore erred in refusing to set it aside and grant a new trial.

Adultery and fornication, though in England cognizable criminally under the ecclesiastical law, were not indictable at common law, and are not therefore punishable in this country unless they are made so by statute. It is hence very competent for the legislature to prescribe not only the penalty for these offenses, but to limit the circumstances under which guilty parties may be prosecuted; and no presumption arises of an intention to render any person liable to a prosecution, except those who are clearly within the provisions of the statute.

In the absence of statutory provisions, the common law, as the guardian of the morals of the people, and their protection against offenses notoriously against public decency and good manners, will take cognizance of, and punish as misdemeanors, acts of adultery or fornication, when committed openly and publicly. An act of incontinency becomes an offense, punishable at common law, only when it is combined with circumstances. which, beyond the mere criminality of the simple fact, were calculated to make it injurious to society, as in case of incontinency in a street or highway.

For these reasons the judgment is reversed, the verdict set aside, and the cause remanded.