### People of the State of Illinois, Appellee, v. Maben Potter, Appellant.

Opinion filed June 1, 1943.

HARRY E. JACKSON, of Waterloo, for appellant.

DAVID N. CONN, State's Attorney, for appellee.

MR. JUSTICE BRISTOW delivered the opinion of the court.

Maben Potter was charged in an information filed by the State's Attorney of Randolph county with unlawfully living in an open state of adultery with Dona Caldwell, a married woman. A trial by jury was had upon this information whereupon the jury returned a verdict finding the defendant guilty. After a motion for new trial was overruled the court sentenced the defendant to the Illinois State Penal Farm at Vandalia for the period of one year. The defendant

questions the correctness of this judgment on this appeal.

Maben Potter was a married man, white, about 42 years of age, whose home was located at 315 Vine street in the city of Sparta. He lived there with his two minor children, his wife having left him some time previously to live in Carbondale, Illinois.

Dona Caldwell was the woman named in the information with whom Maben is charged with living in an open state of adultery. Her husband's name was Sam Caldwell, but she was separated from him and living in a house at the corner of Jefferson and Washington streets in Sparta.

On June 7, 1942, Sam called on Homer Russell, night marshal in Sparta, and reported that his wife and Maben Potter were down at the Caldwell home. Deputy Sheriff Morrison, Mr. Russell and three men went down there, entered the house and went upstairs where they found the defendant under a bed clad only in his B.V.D.s, and Dona Caldwell, nearby, wearing only a dress. The defendant was arrested, denied that he had ever lived with Dona, but admitted that he had had sexual intercourse with her only in the Caldwell home. It is the contention of the defendant here that the evidence wholly failed to sustain the charge "Living in an open state of adultery." No other error is claimed.

Let us briefly consider the evidence presented on behalf of the State at the trial of this case. For many months prior to the defendant's arrest, Dona, who happens to be a colored woman, had been spending the greater part of her time at the home of the defendant. Many neighbors testified that they would see her come to his home four or five evenings a week, they would either not see her leave at all, or on the other hand if they would see her leave it would be early the following morning.

W. F. LaRowe, a witness for the People, testified that during the months of March, April and May, 1942, he was living as a neighbor to Maben Potter. He

stated that he saw her come to his house in the evening and that she would not leave at all during the night, and that Maben Potter was known by him to be there at the time. He said that he went over to Maben's house one Sunday night during that period, that the children, the boy and girl were sleeping in the south room, and the defendant was sleeping in the next room. That upon calling, the defendant came out clad only in his pants. Then defendant told him that "he wanted to show him something"; then defendant brought the colored girl out from his bed, hugged and kissed her and said that "she was the sweetest thing that ever lived."

Juanita Potter, the 14 year old daughter of the defendant, testified that Dona came frequently to her father's house, from January to June; that Dona several nights each week would go into his bedroom and remain all night; that Dona would shave the defendant, cut his toe nails and caress him, and that her father frequently stated in her presence that she was the sweetest thing in all the world and that he would not give her up.

Mary Williamson and several other neighbors testified that they would see this woman come to Maben's home almost every night in the week and stay indefinitely.

Sam Caldwell testified for the State and said that his separation from his wife was due to the continued absence of Dona and her affair with the defendant. He said that this relationship began in October 1942, and that she was away from home "just as many days and nights as there are days and nights in the week." One night in April 1942, Sam went to defendant's home, looking for his wife. He knocked on the door and the defendant shot at him twice. Later he saw his wife flee from the back door.

The State introduced several exhibits, being letters which were admitted to be in the handwriting of Dona and Maben. Decency prevents a publication of any

part of these letters but a reading of them would forbid any thought that their relationship was at all platonic.

The foregoing gives a pretty complete picture of the conduct of the two parties involved in this matter.

Counsel for defendant, while admitting that the conduct of his client was indefensible, sordid, and demoralizing, still he was not guilty as a matter of law of living in an open state of adultery. He strenuously presses upon the court's attention the fact that these two parties had their respective domiciles and lived a major portion of the time therein, and that simply because they enjoyed frequent sexual interviews such is insufficient in law to warrant the above charge.

The statute under consideration reads as follows: "A. If any man and woman shall live together in an open state of adultery, or fornication or adultery and fornication, every such person shall be fined not exceeding $500 or confined in the county jail not exceeding one year." Ill. Rev. Stat. ch. 38, sec. 46 [Jones Ill. Stats. Ann. 37.022]. "B. The offense of adultery shall be sufficiently proved by circumstances which raise the presumption of cohabitation and unlawful intimacy." Ill. Rev. Stat. ch. 38, sec. 47 [Jones Ill. Stats. Ann. 37.023].

The defendant's counsel in support of his contention relies principally upon the case of *Lyman v. People,* 198 Ill. 544. Quoting therefrom at page 550, "The conclusion from all the facts is irresistible that Lyman and Alice lived openly as husband and wife live together; occupied the same room and bed at night; rode about the country together, and generally followed the course of conduct toward each other which husband and wife are accustomed to for about four weeks. No one was deceived into thinking they were husband and wife, for those whom they met knew Lyman had a wife, the mother of his children, living in Kewanee.

But it was not necessary to the crime that the public should believe they were husband and wife." The defendant reasons from the above citation that the open, notorious relationship of adulterers must be conjugal in many other respects than that of unlawful intimacy. The question for this court to determine therefore, is whether the above narrowed construction is legally sustainable.

Illinois is surprisingly barren of law on the subject of what does constitute living in open adultery. The only other Illinois case than the one cited above that is at all enlightening is *Searls v. People,* 13 Ill. 597. The court having under consideration the same statute as the one that occupies our attention here, has this to say; "In order to constitute this crime, the parties must dwell together openly and notoriously, upon terms as if the conjugal relation existed between them. In other words, they must cohabit together. There must be an habitual illicit intercourse between them. The object of the statute was to prohibit the public scandal and disgrace of the living together of persons of opposite sexes notoriously in illicit intimacy, which outrages public decency, having a demoralizing and debasing influence upon society."

Turning to other jurisdictions for assistance in the solution of this problem, we find that many other States have statutes identical with the Illinois enactment. In Am. Jur. vol. 1, p. 688, there is a discussion of the various adjudication of questions arising under such statutory provisions. Quoting therefrom at page 688: "In a number of jurisdictions, the legislatures have created the offense of living in adultery or fornication, founded somewhat on the common law idea that while the act of illicit intercourse should not be punishable, nevertheless, where it is accompanied by circumstances which render it otherwise objectionable, it should be prohibited by law. These statutes in other words do not attempt to control the private immoral

indulgence of the individual or affix a penalty to the furtive illicit intercourse between the sexes, but only to conserve the public morals by the prevention of indecent and evil examples tending to debase and demoralize society and degrade the institution of marriage.'' Further quoting from the same volume at page 689: ''It is unnecessary that the parties should profess to be husband and wife, but usually the notoriety is as material in making out the offense as is the fact of adultery committed. It is the publicity of the offense, the demoralizing and debasing influence of the example, that the law attempts to prevent.'' *Richey v. State,* 172 Ind. 134, 74 A. L. R. 1363, L. R. A. 1916C; *Bird v. State,* 27 Tex. App. 635; *Bodiford v. State,* 86 Ala. 67; *Lawson v. State,* 20 Ala. 65, 74 A. L. R. 1357; *Smith v. State,* 86 Ala. 57.

The leading and most thoroughly considered case upon the subject is that of *State v. Chandler,* 132 Mo. 155. There one Chandler was charged with living in open and notorious adultery with Kitty Coyle. Kitty's husband, becoming somewhat suspicious of his wife's misconduct, employed a detective to watch his residence and Chandler during his absence. The detective hid himself in Coyle's basement, and there saw on the evening following Coyle's departure the defendant enter the front door without being admitted by another. This occurred during each succeeding night from the 13th to the 23rd of March, 1895. He was seen to enter the home between 7:30 and 11:30 and depart therefrom the following morning between 5 and 5:30. Kitty and two servant girls were the only occupants of the home. Mr. Coyle returned home unexpectedly and in company with his detective and others went to his home at nighttime, proceeded stealthily to the bed chambers of Mrs. Coyle and there found the defendant in bed with her, each being arrayed in their nightgowns. Upon trial by jury, the defendant was convicted and this judgment was reversed.

415

The court in his exhaustive opinion analyzed about every leading authority in the United States on the subject of adultery. The cases of *Commonwealth v. Calef,* 10 Mass. 153; *Jones v. Com.,* 80 Va. 18; *Luster v. State,* 23 Fla. 339; *Carotti v. State,* 42 Miss. 334; *Kinard v. State,* 57 Miss. 132, have as their underlying principle, quoting from the last mentioned case, "The decision is that on continuance of illicit intercourse makes out the crime so long as it is secret or attempted to be made so, but that, whenever secrecy is abandoned and the concubinage is open, the offense is complete."

The court in its opinion in reversing the judgment of conviction, made the following pertinent observation: "In the present instance there is an entire absence of any evidence tending to show cohabitation between the parties implicated, in the sense and meaning of the word as declared by the standards of our language and as settled by frequent adjudications. It is not the object of the statute to establish a censorship over the morals of the people, nor to forbid the violation of the seventh commandment. . . . Its evident object was not to forbid and punish furtive illicit interviews between sexes, however frequent and habitual their occurrence; but only to make such acts punishable as it plainly designates; acts which necessarily tend by their openness and notoriety, or by their publicity to debase and lower the standard of public morals." The court further observed, rather significantly, in support of his conclusions reached that the interviews between the defendant and Kitty were so secretive and well protected that even the maid servants, living in the same home, were entirely unaware of this clandestine relationship.

In line with the same thought as announced above is the case of *People v. Salmon,* 148 Cal. 303,—A man and woman who come into a community, when the facts are unknown, and live quietly as husband and wife, with

416

nothing to excite suspicion that their intercourse is adulterous, cannot be convicted of living in a state of open and notorious adultery.

We are of the opinion that the conduct of the parties, as the record discloses the same on this appeal, answers the tests as pronounced in most every jurisdiction. Their immoral life was so brazen and notorious that every neighbor was cognizant of it. Their lustful and clandestine impulses had attained such an arrogant stage that the two parties implicated defied the law and order, and decency of the village of Sparta, and the defendant himself was so devoid of moral scruples that he flaunted the charms and virtues of his paramour in the very presence of his 14 year old daughter. Their relationship had broken two homes, it caused Dona's husband to abandon her, and the defendant's wife to leave him. The conclusion is irresistible that the statute upon which this prosecution is predicated was designed to prohibit such public scandal, and disgraceful living together of persons of opposite sexes in such notoriously illicit intimacy; that which outrages public decency and has a debasing and demoralizing influence upon society. The jury's verdict is justified by the law and the evidence, and the maximum sentence imposed by the trial judge meets with the approval of this court.

*Judgment affirmed.*