INGEBORG MARIANNE STRAND, Plaintiff-Appellant, *v.* RONALD R. STRAND, Defendant-Appellee.

Second District (2nd Division)  No. 75-292

Opinion filed September 1, 1976.

Marcia Hope Zeidman, of Chicago, for appellant.

Cox & Lyle, of Glen Ellyn, for appellee.

Mr. JUSTICE DIXON delivered the opinion of the court:

Plaintiff and counterdefendant Ingeborg Marianne Strand filed a complaint for divorce on the ground of mental cruelty. Her husband Ronald R. Strand counterclaimed on the same ground. Both asked for custody of their children, a boy now 9 and a girl now 11. The Circuit Court of Du Page County found the wife guilty of mental cruelty, found that both parents were fit and proper parents and that it was in the best interest of the children that their custody be awarded to the husband. The wife appeals only from that portion of the judgment awarding custody.

Ingeborg Marianne Strand and Ronald R. Strand were married at Karlsruhe, West Germany, on the 10th day of October, 1964. They lived together as husband and wife from that date until on or about October of 1974. Two children were born to them, Angelique whose date of birth is

the 19th day of March, 1965, and Richard, whose date of birth is the 16th day of May, 1967.

After hearing the testimony of the witnesses, the court had a conversation with the children in chambers upon stipulation of both of the attorneys. The attorneys also presented their individual client's plans if they were awarded custody of the children.

## WIFE'S CASE

Ronald Strand, under section 60, merely testified as to financial matters and they are not an issue in this appeal.

Ingeborg Marianne Strand testified that two children were born of the marriage of she and her husband, that they were minor children and that she was a fit and proper person to have their care; that she was employed and worked as a budget administrator. That at the present time her hours of employment were 9:30 a.m. until 3 p.m.; that she went to work at the insistance of her husband; that most of her free time was spent with the children, playing with them and taking them places, to museums, ballgames, parks and to the zoo, or if they do not go somewhere, that she plays with them at home and helps them with their homework; that Mr. Strand does not participate in these activities with her and the children and instead he watches television; that her normal, daily routine is that for her to wake up, fix the children their breakfast, make their school lunches, lay out their clothes, at which time the children leave for school and she leaves for work. After school she helps with homework, plays games and prepares supper, and in the evening, after the children are in bed, she does her housework. Her weekends are filled with taking the children horseback riding, grocery shopping, doing laundry or playing with the children. She does the light housework and the heavy housework is done by a lady who comes in. Her husband's discipline of the children consists of beating them with the buckle end of a belt and several years ago he struck their daughter in the eye and injured her. The children attend school regularly and have excellent grades. The children attend church and Sunday School, are learning German as a second language, and she has introduced the children to music.

In October 1974, she visited her husband at Fort Leavenworth, made suggestion with respect to a reconciliation (although there had been no marital separation) and she suggested that the two of them see a marriage counselor, a Dr. Robert Randall. She saw Dr. Randall on five or six occasions but her husband has continued to go to see him. Her husband had previously seen a psychiatrist in Madison, Wisconsin, for about a year and that Mr. Strand had told her that the psychiatrist told him that his problem boiled down to the way his mother treated him when he was a child.

Under cross-examination she indicated that she knew a David Silva, that he was a co-worker with her and that his present home telephone number was 366-2061. She had called him regarding her job on one occasion in July 1974, and also had accompanied him and her parents to a movie of a soccer game during July 1974. During the time her husband was at camp, from August 5 through December 13, 1974, she could not estimate how many times David Silva was at her home but it was probably around 20 times. He mostly came on Saturdays or Sundays to play with the children and on a few occasions he was there during the week.

David Silva drives a maroon Ford, stayed overnight on two occasions, once when he helped clean out the house because of a flood and the second time in order to babysit with the children early in the morning so that she could see a doctor. She had only been with David socially on one occasion and that was for her birthday party which she took David to. She picked David up at 8 p.m. and she returned home after dropping David off at his home at approximately 4 a.m. During her husband's absence, Mr. Silva took her and her children to six soccer games and one baseball game at Wrigley Field and also attended one openhouse with her and the children at the children's school. She took the children to Sunday School when Mr. Strand was at camp but since his return he has taken the children to Sunday School. She goes to a different church. She kept going to her old church until Christmastime and then, at the end of January, she started to go to the Faith Congregational Church. When Mr. Silva would visit the children he would arrive during the daylight hours and play with the children in the front yard which was open and obvious to all the neighbors and people who were passing by. He would also park his car in the driveway or on the street, where all the neighbors could see him leave. From September until February her working hours were 8:30 a.m. to 4:30 p.m. and she would arrive home at 5 p.m. These hours continued until January 1975 because she could not find a person who would take care of the children between the time they got out of school and the time she got home from work. She had a previous arrangement with Mrs. Provensano to leave a key at her home for the children to pick up and go home. This arrangement with Mrs. Provensano went on until the end of November. She had discussed it with her husband and he did not like the arrangement because the children were alone. She then made arrangements with Mrs. Wick and the children would stay with her until she arrived home. Mrs. Wick told her at the end of February, that she did not want to watch the children anymore and that is when she asked for the new hours at work so that she could be home with the children when they got home from school.

The plaintiff then called Hildegard Ball as a witness on her behalf and

Mrs. Ball testified that she works with Mrs. Strand and rides back and forth to work with her and on cross-examination, Mrs. Ball testified that the children were nice kids, were courteous and that she felt that this conduct was the result of both Mr. and Mrs. Strand's raising of the children.

The plaintiff then closed her case.

## HUSBAND'S CASE

The defendant called as his first witness, Eileen Cestone, a neighbor. She testified that she has lived next door to the Strands all the time that the Strands have lived there and that she has three children, one age five, one age three and a baby 6½ months. Mr. Strand was gone approximately four months last year and during that time she had an opportunity to observe a gentleman arrive and leave the Strand home in a maroon Ford automobile. She determined that his name was David and that he was at the Strand residence approximately six times per week. He would arrive during the evening hours and leave at different times. On the average, two or three times per week, he would leave between the hours of 4 and 6 a.m. She further testified that Mr. Strand was a very hard worker and maintains one of the nicest homes in the area. She would observe him five or six times a week with his children and it appeared that he had a good relationship with them.

Upon cross-examination, Mrs. Cestone testified that as far as she knew, the children were in the house at all times when David was there. Further, she would see David play in the back yard with the Strand children and with other children in the neighborhood and they would play soccer. He would never at any time attempt to disguise or hide his presence, and he would park his car on the street where everybody could see it even when he was there late at night.

The next witness called on behalf of the defendant counterplaintiff was Judy Provenzano, a neighbor and mother of three children, ages six, four and nine months. She testified that she had been a neighbor of the Strands for approximately one year, that during the period of August through December of 1974 she was able to observe people coming and going from the Strand house, that she observed a man come to the Strand house approximately six times a week and two or three times a week he would leave the house somewhere between 2 a.m. and 6 a.m. and that she did not feel that Mrs. Strand's conduct was in the best interest of the children. It was her opinion that Mr. Strand was a fit person to have the custody of the children because he is very capable and because he is a sincere and good person.

On cross-examination Mrs. Provenzano testified that the arrangement she had with Marianne was that the children were to report to her home

after school, pick up the key to their house and go home. She had no understanding with Mrs. Strand regarding what to do if anything happened, did not have a telephone number for Mrs. Strand but would have gotten in touch with her if she had to by calling another neighbor to find out the telephone number.

The next witness called was Diane Wick, a neighbor living across the street from the Strand residence. She testified that she has lived there two years and that in November of 1974 plaintiff asked her to babysit with her children after school. She testified that the plaintiff had told her that her husband, when he came back from Leavenworth, told plaintiff he didn't want the children left alone and he wanted her to have a babysitter for the children. She agreed to babysit from the time the children got home from school until plaintiff picked them up between 5 p.m. and 5:30 p.m. She further testified that she was aware that Mr. Strand was gone the latter part of the summer and fall of 1974 and that during that time she observed a man in and around the Strand home. She noticed him quite a bit in the evenings and then it seemed like every weekend he was there. She further testified that she saw Mr. Strand and the children play together quite often, that there was no conflict between them and they seemed to get along real fine and that it was her opinion that the children would be better off with Mr. Strand.

Ronald R. Strand testified that in October of 1974 his wife visited him at Fort Leavenworth, that there was a conversation with relation to the status of their marriage and that his wife indicated that she was uncertain and mixed up, that she didn't know exactly how she felt about the marriage, that she wanted to see a marriage counselor and that this is the first time she had ever indicated that she wanted to see a marriage counselor. She indicated that she didn't know whether she loved Mr. Strand anymore. Mr. Strand asked her if there was another man involved and she said "no". She said she had no emotional involvement with David. He testified that David's name had come up from a previous telephone conversation at which time he told her to be careful about her conduct with David, in that, it was very suspicious looking and that she should be especially certain that it didn't do anything that would lead the neighbors to start talking and harm the children. He testified that he had had a conversation with the plaintiff about a year and a half previously wherein he questioned her plans regarding a United States citizenship. Marianne indicated that she didn't have any plans because she felt she was better off to have both German citizenship and alien resident status in the United States and in that way she was free to go to whatever country she felt was best.

On November 30 when Marianne returned from her birthday party he questioned her about her conduct with David which she first denied but

after informing her as to what the children had told him and that he was going to contact a lawyer she indicated that what the children had told him was true but that she did not want the children brought into it.

Mr. Strand testified as to his manner of disciplining the children and he indicated he would first try to reason with them and to talk to them, if that didn't work he would try punishment such as asking them to go to their room and staying there for a while and as a last resort he would spank them, that he never hit either of the children with a belt buckle but that he did sometimes spank them with a belt.

He further testified that on the one occasion that he was punishing his daughter he attempted to slap her, she ducked, and his ring cut her on the eyebrow; that he apologized and told her that he was sorry; that his children were not afraid of him; that the conduct on the part of his wife while he was at camp caused him a great deal of anxiety; that he has watched the children and has seen changes in the children; that he has watched and heard her defaming him in front of the children and has seen the confusion in the children's faces, which has also caused him a great deal of anxiety, and that he is a Major in the Army Reserve and has security clearance.

The plan of the plaintiff, in the event she were granted custody of the children, indicated that the plaintiff would continue to work and when the children were not at school, would provide a babysitter for the children in the person of the mother of a friend and try to make them good citizens, and would see to their school training, their religious training, and their personal needs.

The plan of Mr. Strand for the care of the children in the event custody were granted to him indicated that Mr. Strand was prepared to maintain a home for the children in the general vicinity where they were being raised; the paternal grandmother would reside with them and take care of the children. Because of the fact that his mother would be living with them, there would be a continuity of relationship throughout the year.

■■ The wife contends that it was an abuse of discretion to award custody to the father where the mother was found to be a fit parent. She points out the truisms expressed in *Nye v. Nye*, 411 Ill. 408, arguing that *Nye* stands for the proposition that unless a mother is unfit she should automatically be given custody of children in the early years of infancy.

We agree that one of the guiding principles in custody cases, as expressed in *Nye* (but distinctly subordinate to the child's welfare), is the rule that ordinarily the custody of an infant of tender years should be given to the mother if she is found fit to have custody and can supply a proper home. The rule is based on the concept that there is no substitute for a mother's love.

The *Nye* case involved a modification of an original decree based on

desertion where a nonworking mother had been found fit and was given custody by agreement. At the hearing for modification the trial court over objection admitted and was influenced by testimony of adultery occurring before the decree. This testimony was not admissible. The wife's post-divorce misconduct was not adultery. (See *Nye v. Nye*, 343 Ill. App. 477, 481, 482. The supreme court, affirming the appellate court, stated, "The determination of the appellate court was correct on all points of law." 411 Ill. 408, 416.

Further any preference to the mother in *Nye* was also based on the assumption that she would remain in the home and thereby be better able to care for the young child on a full-time basis. *Patton v. Armstrong*, 16 Ill. App. 3d 881, 882.

Under the conditions in *Nye* and other cases involving modification of the original decree and a change of custody from the mother to the father it would be an abuse of discretion to change custody unless there was a proper determination of unfitness on the mother's part, or sufficient proof of changed conditions since the original custody order. (See *Carlson v. Carlson*, 80 Ill. App. 2d 251, 255.) In the instant case Mrs. Strand was not previously given custody of the children by court order.

There is no authority to support the contention that in Illinois there is an arbitrary rule that unless there is evidence that a mother is unfit, she should have the custody of young children *(Carlson,* at 255; *Vysoky v. Vysoky*, 85 Ill. App. 2d 306, 311; *Braun v. Goodman*, 3 Ill. App. 3d 1002, 1005; *Fears v. Fears*, 5 Ill. App. 3d 610, 612; *Girolamo v. Girolamo*, 5 Ill. App. 3d 627, 630; *Huey v. Huey*, 25 Ill. App. 3d 20, 21; *Brady v. Brady*, 26 Ill. App. 3d 131, 138). The fact that the mother is fit is only one factor to be considered by the trial court. There is no longer a presumption in favor of the mother. *Drake v. Hohimer*, 35 Ill. App. 3d 529, 530. *Marcus v. Marcus*, 24 Ill. App. 3d 401, 407; *Pratt v. Pratt*, 29 Ill. App. 3d 214, 216.

The welfare of the child is the principle of the decisions. This principle has influenced courts to give custody to mothers even though there is a showing of adultery or other immoral conduct bearing on the capacity for good motherhood. The same principle has influenced other courts to deny custody where a showing of misconduct of this nature has been made. The parents' moral character and conduct is subject to inquiry to determine relative fitness. Not infrequently there is a close balance in the relative fitness of the parents and the other circumstances to be taken into consideration so that it is difficult to find reasons why one parent should be preferred over the other, yet there must be a decision. In the last analysis that decision must rest in the broad discretion of the trial court, a fact well recognized in all the cases. Annot., 23 A.L.R. 3d 6 (1969).

■■ It is in the connection with the weighing of relative fitness that the question arises whether and to what extent the guilt of the husband or

wife leading to the divorce should be taken into consideration when it comes to an award of custody since the fact that a parent was held guilty of misconduct warranting a divorce decree in favor of the other parent may or may not constitute a reflection on the parent's relative fitness to have custody. A wife's indiscreet conduct with another man is important as far as the custody question is concerned as it reflects on her present relative fitness to have the care of the children. The courts do not award custody to an adulterous mother to reward her—the award is made in spite of such conduct when it appears that it is for the best interests of the child.

The wife herein has also cited *Huey v. Huey,* 25 Ill. App. 3d 20, involving the award of custody of a seven-year-old girl to a hellcat who was found to be a fit mother despite admitted adultery, husband beating, conviction of a felony and intemperance in the use of alcohol. That case was decided (25 Ill. App. 3d 20, 23) on the basis of the broad discretion of the trial court. It is an example of how broad that discretion may be.

■■ In reviewing orders bearing on child custody it is the duty of this court to give constant and unswerving attention to the best interests of the children. However the trier of the fact has significant opportunity to observe both parents and the children and thus is able to assess and evaluate their temperaments, personalities and capabilities. We should not disturb the determination of the trial court unless it has resulted in manifest injustice or is against the manifest weight of the evidence. The presumption in favor of the result reached by the trial court is always strong and compelling in this type of case. Despite the able arguments of counsel for the mother, we do not feel justified in reversing the judgment of the trial judge. Accordingly that part of the judgment appealed from will be affirmed.

Affirmed.

T. J. MORAN, P. J., and RECHENMACHER, J., concur.