(No. 51431

JACQUELINE JARRETT, Appellee, v. WALTER JARRETT, Appellant.

*Opinion filed December 20, 1979.—Rehearing denied February 1, 1980.*

GOLDENHERSH, C.J., and MORAN, J., dissenting.

Lois Solomon and Arthur M. Solomon, of Solomon & Behrendt, of Chicago, for appellant.

Michael H. Minton, of Facchini & Minton, of Arlington Heights, for appellee.

Donald C. Schiller, Douglas P. Maloney, and James T. Friedman, of Chicago, for *amicus curiae* American Academy of Matrimonial Lawyers (Illinois Chapter).

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

On December 6, 1976, Jacqueline Jarrett received a divorce from Walter Jarrett in the circuit court of Cook County on grounds of extreme and repeated mental

cruelty. The divorce decree, by agreement, also awarded Jacqueline custody of the three Jarrett children subject to the father's right of visitation at reasonable times. Seven months later, alleging changed conditions, Walter petitioned the circuit court to modify the divorce decree and award him custody of the children. The circuit court granted his petition subject to the mother's right of visitation at reasonable times, but a majority of the appellate court reversed (64 Ill. App. 3d 932), and we granted leave to appeal.

During their marriage, Walter and Jacqueline had three daughters, who, at the time of the divorce, were 12, 10 and 7 years old. In addition to custody of the children, the divorce decree also awarded Jacqueline the use of the family home, and child support; Walter received visitation rights at all reasonable times and usually had the children from Saturday evening to Sunday evening. In April 1977, five months after the divorce, Jacqueline informed Walter that she planned to have her boyfriend, Wayne Hammon, move into the family home with her. Walter protested, but Hammon moved in on May 1, 1977. Jacqueline and Hammon thereafter cohabited in the Jarrett home but did not marry.

The children, who were not "overly enthused" when they first learned that Hammon would move into the family home with them, asked Jacqueline if she intended to marry Hammon, but Jacqueline responded that she did not know. At the modification hearing Jacqueline testified that she did not want to remarry because it was too soon after her divorce; because she did not believe that a marriage license makes a relationship; and because the divorce decree required her to sell the family home within six months after remarriage. She did not want to sell the house because the children did not want to move and she could not afford to do so. Jacqueline explained to the children that some people thought it was wrong for an unmarried man and woman to live together but she

thought that what mattered was that they loved each other. Jacqueline testified that she told some neighbors that Hammon would move in with her but that she had not received any adverse comments. Jacqueline further testified that the children seemed to develop an affectionate relationship with Hammon, who played with them, helped them with their homework, and verbally disciplined them. Both Jacqueline and Hammon testified at the hearing that they did not at that time have any plans to marry. In oral argument before this court Jacqueline's counsel conceded that she and Hammon were still living together unmarried.

Walter Jarrett testified that he thought Jacqueline's living arrangements created a moral environment which was not a proper one in which to raise three young girls. He also testified that the children were always clean, healthy, well dressed and well nourished when he picked them up, and that when he talked with his oldest daughter, Kathleen, she did not object to Jacqueline's living arrangement.

The circuit court found that it was "necessary for the moral and spiritual well-being and development" of the children that Walter receive custody. In reversing, the appellate court reasoned that the record did not reveal any negative effects on the children caused by Jacqueline's cohabitation with Hammon, and that the circuit court had not found Jacqueline unfit. It declined to consider potential future harmful effects of the cohabitation on the children. 64 Ill. App. 3d 932, 937.

Both parties to this litigation have relied on sections 602 and 610 of the new Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, pars. 602, 610), which provide:

> "Sec. 602. Best interest of child.
>
> (a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:
>
> (1) the wishes of the child's parent or parents

as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community; and

(5) the mental and physical health of all individuals involved.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child."

"Sec. 610. Modification.

(a) No motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.

(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:

\* \* \*

(3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him.

(c) \*\*\*"

We note initially, however, that this appeal from the custody modification order was taken on August 11, 1977, two months before the effective date of the new act, and that the new act expressly provides that prior law shall govern such an appeal (Ill. Rev. Stat. 1977, ch. 40, par. 801(d)). While the sections of the new act governing

modification of custody orders require explicit findings (see *In re Custody of Harne* (1979), 77 Ill. 2d 414), we believe those sections in substance codify the prior decisional law, and that our decision in this appeal is not affected by the applicability or nonapplicability of the new act.

The standards applicable to petitions for modification of custody appearing in section 610(b) are substantially those to which Illinois courts have long adhered. In *Nye v. Nye* (1952), 411 Ill. 408, 416, this court said that a divorce decree "is *res judicata* as to the facts which existed at the time it was entered" and that "[n] ew conditions must have arisen to warrant the court changing its prior custody determination." Moreover, the guiding principle in custody adjudications is the best interests of the child (411 Ill. 408, 415) and the change in conditions must adversely affect the best interests of the child (411 Ill. 408, 416). The prior statute also directed the attention of the court to the interests of the child in custody adjudications (sections 13 and 18 of the Divorce Act (Ill. Rev. Stat. 1975, ch. 40, pars. 14, 19), repealed by the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, pars. 101 to 802)). Although prior Illinois decisions did not explicitly articulate the new act's command that no change be made in custody unless the harm inherent in any change in custody is outweighed by the advantages to the child of the new environment, they did recognize that continuity in the child's environment is in itself important. (*Bergan v. Bergan* (1976), 42 Ill. App. 3d 740, 743; *Holloway v. Holloway* (1973), 10 Ill. App. 3d 662, 665; *Collings v. Collings* (1970), 120 Ill. App. 2d 125, 128; *Jenkins v. Jenkins* (1967), 81 Ill. App. 2d 67, 72, 74; *Leary v. Leary* (1965), 61 Ill. App. 2d 152, 155.) Finally, the commands of sections 602 and 610 of the new act to consider only whether the child's environment endangers his physical, mental, moral and emotional health (Ill. Rev. Stat. 1977, ch. 40, par. 610) and to disregard any

conduct of the custodian that does not affect his relationship with the child (Ill. Rev. Stat. 1977, ch. 40, par. 602) reemphasize the principle stated in *Nye v. Nye* (1952), 411 Ill. 408, that the focus of custody determinations must be the welfare of the child.

The chief issue in this case is whether a change of custody predicated upon the open and continuing cohabitation of the custodial parent with a member of the opposite sex is contrary to the manifest weight of the evidence in the absence of any tangible evidence of contemporaneous adverse effect upon the minor children. Considering the principles previously enunciated, and the statutory provisions, and prior decisions of the courts of this State, we conclude that under the facts in this case the trial court properly transferred custody of the Jarrett children from Jacqueline to Walter Jarrett.

The relevant standards of conduct are expressed in the statutes of this State: Section 11—8 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 11—8) provides that "[a]ny person who cohabits or has sexual intercourse with another not his spouse commits fornication if the behavior is open and notorious." In *Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 61-62, we emphasized the refusal of the General Assembly in enacting the new Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) to sanction any nonmarital relationships and its declaration of the purpose to "strengthen and preserve the integrity of marriage and safeguard family relationships" (Ill. Rev. Stat. 1977, ch. 40, par. 102(2)).

Jacqueline argues, however, that her conduct does not affront public morality because such conduct is now widely accepted, and cites 1978 Census Bureau statistics that show 1.1 million households composed of an unmarried man and woman, close to a quarter of which also include at least one child. This is essentially the same argument we rejected last term in *Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, and it is equally unpersuasive here. The

number of people living in such households forms only a small percentage of the adult population, but more to the point, the statutory interpretation urged upon us by Jacqueline simply nullifies the fornication statute. The logical conclusion of her argument is that the statutory prohibitions are void as to those who believe the proscribed acts are not immoral, or, for one reason or another, need not be heeded. So stated, of course, the argument defeats itself. The rules which our society enacts for the governance of its members are not limited to those who agree with those rules—they are equally binding on the dissenters. The fornication statute and the Illinois Marriage and Dissolution of Marriage Act evidence the relevant moral standards of this State, as declared by our legislature. The open and notorious limitation on the former's prohibitions reflects both a disinclination to criminalize purely private relationships and a recognition that open fornication represents a graver threat to public morality than private violations. Conduct of that nature, when it is open, not only violates the statutorily expressed moral standards of the State, but also encourages others to violate those standards, and debases public morality. While we agree that the statute does not penalize conduct which is essentially private and discreet (*People v. Cessna* (1976), 42 Ill. App. 3d 746, 749), Jacqueline's conduct has been neither, for she has discussed this relationship and her rationalization of it with at least her children, her former husband and her neighbors. It is, in our judgment, clear that her conduct offends prevailing public policy. *Lyman v. People* (1902), 198 Ill. 544, 549-50; *Searls v. People* (1852), 13 Ill. 597, 598; *People v. Potter* (1943), 319 Ill. App. 409, 410-11, 416.

Jacqueline's disregard for existing standards of conduct instructs her children, by example, that they, too, may ignore them (see *Stark v. Stark* (1973), 13 Ill. App. 3d 35; *Brown v. Brown* (1977), 218 Va. 196, 237 S.E.2d 89), and could well encourage the children to engage in

similar activity in the future. That factor, of course, supports the trial court's conclusion that their daily presence in that environment was injurious to the moral well-being and development of the children.

It is true that, as Jacqueline argues, the courts have not denied custody to every parent who has violated the community's moral standards, nor do we now intimate a different rule. Rather than mechanically denying custody in every such instance, the courts of this State appraise the moral example currently provided and the example which may be expected by the parent in the future. We held in *Nye v. Nye* (1952), 411 Ill. 408, 415, that past moral indiscretions of a parent are not sufficient grounds for denying custody if the parent's present conduct establishes the improbability of such lapses in the future. This rule focuses the trial court's attention on the moral values which the parent is actually demonstrating to the children.

Since the decision in *Nye,* the appellate courts of this State have repeatedly emphasized this principle, particularly when the children were unaware of their parent's moral indiscretion. (*Hendrickson v. Hendrickson* (1977), 49 Ill. App. 3d 160; *Strand v. Strand* (1976), 41 Ill. App. 3d 651; *Christensen v. Christensen* (1975), 31 Ill. App. 3d 1041; *Huey v. Huey* (1975), 25 Ill. App. 3d 20; *Mulvihill v. Mulvihill* (1974), 20 Ill. App. 3d 440; *Hahn v. Hahn* (1966), 69 Ill. App. 2d 302; *Leary v. Leary* (1965), 61 Ill. App. 2d 152; *Jayroe v. Jayroe* (1965), 58 Ill. App. 2d 79; *Arden v. Arden* (1960), 25 Ill. App. 2d 181; *Wolfrum v. Wolfrum* (1955), 5 Ill. App. 2d 471.) At the time of this hearing, however, and even when this case was argued orally to this court, Jacqueline continued to cohabit with Wayne Hammon and had done nothing to indicate that this relationship would not continue in the future. Thus the moral values which Jacqueline currently represents to her children, and those which she may be expected to portray to them in the future, contravene statutorily declared standards of conduct and endanger the

children's moral development.

Jacqueline argues, however, that three recent cases—
*Burris v. Burris* (1979), 70 Ill. App. 3d 503, *In re Marriage
of Farris* (1979), 69 Ill. App. 3d 1042, and *Rippon v.
Rippon* (1978), 64 Ill. App. 3d 465—indicate that the
moral indiscretion of a parent is not sufficient ground for
denial of custody. In *Rippon* the mother who had
committed the indiscretion planned to marry her para-
mour and there was no indication of future misconduct.
*Rippon* therefore falls within the rule set out in *Nye*. Both
*Farris* and *Burris* were rendered after, and relied upon, the
appellate decisions in this case (64 Ill. App. 3d 932) and in
*Hewitt v. Hewitt* (1978), 62 Ill. App. 3d 861, both of
which we have now reversed.

Jacqueline also argues, and the appellate court
agreed (64 Ill. App. 3d 932, 937), that the trial court's
decision to grant custody of the children to Walter Jarrett
was an improper assertion by the trial judge of his own
personal moral beliefs. She further argues that the asser-
tion of moral values in this case, as in *Hewitt v. Hewitt*
(1979), 77 Ill. 2d 49, is a task more appropriately carried
out by the legislature. As pointed out earlier, however, it is
the legislature which has established the standards she has
chosen to ignore, and the action of the trial court merely
implemented principles which have long been followed in
this State.

The mother argues, too, that section 610 of the
Illinois Marriage and Dissolution of Marriage Act (Ill. Rev.
Stat. 1977, ch. 40, par. 610) requires the trial court to
refrain from modifying a prior custody decree unless it
finds that the children have suffered actual tangible harm.
The statute, however, directs the trial court to determine
whether "the child's present environment *endangers*
seriously his physical, mental, moral or emotional health."
(Emphasis added.) (Ill. Rev. Stat. 1977, ch. 40, par.
610(b)(3).) In some cases, particularly those involving
physical harm, it may be appropriate for the trial court to

determine whether the child is endangered by considering evidence of actual harm. In cases such as this one, however, such a narrow interpretation of the statute would defeat its purpose. At the time of the hearing the three Jarrett children, who were then 12, 10 and 7 years old, were obviously incapable of emulating their mother's moral indiscretions. To wait until later years to determine whether Jacqueline had inculcated her moral values in the children would be to await a demonstration that the very harm which the statute seeks to avoid had occurred. Measures to safeguard the moral well-being of children, whose lives have already been disrupted by the divorce of their parents, cannot have been intended to be delayed until there are tangible manifestations of damage to their character.

While our comments have focused upon the moral hazards, we are not convinced that open cohabitation does not also affect the mental and emotional health of the children. Jacqueline's testimony at the hearing indicated that when her children originally learned that Wayne Hammon would move in with them, they initially expected that she would marry him. It is difficult to predict what psychological effects or problems may later develop from their efforts to overcome the disparity between their concepts of propriety and their mother's conduct. (*Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 949.) Nor will their attempts to adjust to this new environment occur in a vacuum. Jacqueline's domestic arrangements are known to her neighbors and their children; testimony at the hearing indicated that Wayne Hammon played with the Jarrett children and their friends at the Jarrett home and also engaged in other activities with them. If the Jarrett children remained in that situation, they might well be compelled to try to explain Hammon's presence to their friends and, perhaps, to endure their taunts and jibes. In a case such as this the trial judge must also weigh these imponderables, and he is not limited to examining the

children for current physical manifestations of emotional or mental difficulties.

Finally, we do not believe that the United States Supreme Court's opinion in *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, requires a different result. In *Stanley* the Supreme Court found that Illinois statutes created a presumption that an unwed father is unfit to exercise custody over his children. The court held that depriving an unwed father of his illegitimate children without a prior hearing to determine his actual rather than presumptive unfitness, when the State accords that protection to other parents, deprives him of equal protection of the law.

The case before us is fundamentally different. The trial court did not presume that Jacqueline was not an adequate parent, as the juvenile court in effect did in *Stanley*. Rather the trial court recognized that the affection and care of a parent do not alone assure the welfare of the child if other conduct of the parent threatens the child's moral development. Since the evidence indicated that Jacqueline had not terminated the troublesome relationship and would probably continue it in the future, the trial court transferred custody to Walter Jarrett, an equally caring and affectionate parent whose conduct did not contravene the standards established by the General Assembly and earlier judicial decisions. Its action in doing so was not contrary to the manifest weight of the evidence.

Accordingly, we reverse the judgment of the appellate court and affirm the judgment of the circuit court of Cook County.

*Appellate court reversed;*
*circuit court affirmed.*

MR. CHIEF JUSTICE GOLDENHERSH, with whom MR. JUSTICE MORAN joins, dissenting:

The majority states, "The chief issue in this case is whether a change of custody predicated upon the open

and continuing cohabitation of the custodial parent with a member of the opposite sex is contrary to the manifest weight of the evidence in the absence of any tangible evidence of contemporaneous adverse effect upon the minor children." (78 Ill. 2d at 345.) An examination of the opinion fails to reveal any other issue, and the effect of the decision is that the plaintiff's cohabitation with Hammon *per se* was sufficient grounds for changing the custody order previously entered. This record shows clearly that the children were healthy, well adjusted, and well cared for, and it should be noted that both the circuit and appellate courts made no finding that plaintiff was an unfit mother. The majority, too, makes no such finding and based its decision on a nebulous concept of injury to the children's "moral well-being and development." (78 Ill. 2d at 347.) I question that any competent sociologist would attribute the increase of "live in" unmarried couples to parental example.

The fragility of its conclusion concerning "prevailing public policy" is demonstrated by the majority's reliance on cases decided by this court in 1852 (*Searls v. People,* 13 Ill. 597) and 1902 (*Lyman v. People*, 198 Ill. 544), and an appellate court decision (*People v. Potter* (1943), 319 Ill. App. 409) which, rather than "prevailing public policy," more clearly indicates the prejudice extant in that period against interracial sexual relations.

As the appellate court pointed out, the courts should not impose the personal preferences and standards of the judiciary in the decision of this case. Courts are uniquely equipped to decide legal issues and are well advised to leave to the theologians the question of the morality of the living arrangement into which the plaintiff had entered.

As a legal matter, simply stated, the majority has held that on the basis of her presumptive guilt of fornication, a Class B misdemeanor, plaintiff, although not declared to be an unfit mother, has forfeited the right to have the custody of her children. This finding flies in the face of

the established rule that, in order to modify or amend an award of custody, the evidence must show that the parent to whom custody of the children was originally awarded is unfit to retain custody, or that a change of conditions makes a change of custody in their best interests. This record fails to show either. Mr. Justice Moran and I dissent and would affirm the decision of the appellate court.

MR. JUSTICE MORAN, with whom MR. CHIEF JUSTICE GOLDENHERSH joins, dissenting:

I join in the dissent of the chief justice, but also dissent separately. My primary disagreement with the majority lies with its countenancing a change of custody based solely on a *conclusive presumption* that harm to the Jarrett children stemmed from Jacqueline's living arrangements. The majority purports to follow the Illinois Marriage and Dissolution of Marriage Act. Yet, under that act, only on the basis of fact can there be a finding that a change in circumstances has occurred and that modification of the prior custody judgment is necessary to serve the best interest of the children. (Ill. Rev. Stat. 1977, ch. 40, par. 610(b).) The court is not to consider conduct of a custodian if that conduct does not affect his relationship to the child. (Ill. Rev. Stat. 1977, ch. 40, par. 602(b).) In this case, not one scintilla of actual or statistical evidence of harm or danger to the children has been presented. To the contrary, all of the evidence of record, as related by the majority, indicates that under Jacqueline's custodianship the children's welfare and needs were met. Also, the trial court expressly declined to find Jacqueline unfit. Nevertheless, the majority's finding of a violation of the seldom-enforced fornication statute effectively foreclosed any further consideration of the custody issue. Instead of focusing solely on the best interest of the children—the "guiding star" (*Nye v. Nye* (1952), 411 Ill. 408, 415)—the majority has utilized

child custody as a vehicle to punish Jacqueline for her "misconduct." Such selective enforcement of a statute is inappropriate and, especially in the child-custody context, unfortunate.

The majority decision also is at odds with the principle of *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208. The constitutional infirmity of the statutory presumption in *Stanley* casts doubt on the validity of the judicially created conclusive presumption in this case. After *Stanley,* an unwed father may not be deprived of his illegitimate children without a prior hearing to determine his actual fitness. Similarly, Jacqueline should not be deprived of the children in the absence of evidence that a change is necessary to serve the best interest of the children. A hearing at which custody is determined on the basis of the conclusive presumption sanctioned by the majority amounts to no hearing at all.