*In re* MARRIAGE OF SANDRA L. POSTON, Petitioner-Appellant, and TERRELL POSTON, Respondent-Appellee.

Third District   No. 79-38

Opinion filed October 22, 1979.

Frank S. Wallace and Dorothea O'Dean, both of Winstein, Kavensky, Wallace & Doughty, of Rock Island, for appellant.

Dennis De Porter, of Braud, Warner, Neppl & Westensee, of Rock Island, for appellee.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Sandra L. Hofmann, formerly Sandra Poston, appeals from the judgment of the Circuit Court of Rock Island County transferring the

custody of her son Sean from her to her former husband, Terrell Poston. Terrell Poston had filed a petition to modify the custody order with respect to the couple's three children, all of whom had been placed in Sandra's custody after the 1974 divorce. This appeal concerns only the award of custody with respect to Sean Poston, aged 10 at the time of the modification proceedings. Sandra Hofmann contends that the decision of the circuit court, awarding custody of Sean to Terrell Poston, was against the manifest weight of the evidence and not conducive to his best interests. She also argues that the order modifying the original decree failed to satisfy the requirements of section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 610(b)) that such orders contain explicit findings as to the basis for custody modifications.

The divorce decree in the original action was entered on August 2, 1974, in which, by stipulation, custody of the Postons' three minor children—Mark (then 10), Tamara (then 9) and Sean (then 6)—was awarded to Sandra Poston. Terrell Poston was given rights to reasonable visitation. Subsequent to the entry of the divorce, both parties remarried. Sandra Poston married Vernon Hofmann and two children were born of that marriage. Terrell Poston remarried and was then divorced again. On September 21, 1978, Terrell Poston filed with the circuit court a petition for modification of the divorce decree, alleging that a material and substantial change in circumstances existed such that the best interests of the children would be served by a modification of the custody provisions of the original decree. He sought custody of the couple's three children. He alleged in his petition that the children (then 14, 13 and 10 respectively) were physically abused and emotionally neglected, that they desired that their father have their custody and care, and that he could provide a proper environment for them. Allegations were included which conformed to section 610 of the Marriage and Dissolution of Marriage Act (hereinafter the Act) that the children's present environment seriously endangered their physical, mental, moral or emotional health. A trial on the merits was held before a circuit judge and extensive testimony was taken from all concerned.

After the trial, the parties apparently agreed to respect the wishes of the two older children with regard to custody. Mark, age 14, chose to live with his mother and stepfather on their farm. Tamara, age 13, chose to leave her mother and stepfather, with whom she had been living, and to live with her father, Terrell Poston. The court's final judgment reflected the children's choices and the parties' agreement. The only dispute was with respect to the custody of Sean, age 10. As to Sean, the circuit court found that it was in his best interest that custody be changed. The court awarded custody of Sean to his father, Terrell Poston. Reasonable visitation for his mother, Sandra Hofmann, was also provided. An appeal

from that decision and judgment was prosecuted. On appeal, Sandra Hofmann argues that the court erred in its order and that its decision is contrary to the manifest weight of the evidence and against Sean's best interests. As noted previously, an issue is also raised as to the necessity of written findings showing the statutory basis upon which the change was ordered.

■■ The Illinois Marriage and Dissolution of Marriage Act specifically sets forth criteria which must be met before a trial court may modify a custody judgment. (Ill. Rev. Stat. 1977, ch. 40, par. 610.) The relevant criteria for modification under Section 610 are:

> "(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:

> ✿ ✿ ✿

> (3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

While, as we noted in *Caulkins v. Caulkins* (1979), 68 Ill. App. 3d 284, 385 N.E.2d 1117, section 610(b) is largely a codification of existing Illinois case law, a renewed emphasis on retaining existing custody relationships is also apparent in the language used by the legislature. As noted recently by the Illinois Supreme court in *In re Custody of Harne* (1979), 77 Ill. 2d 414, 420-21, 396 N.E.2d 499, 502:

> "We believe that section 610(b) of the Illinois Marriage and Dissolution of Marriage Act, like section 409(b) of the uniform act, reflects an underlying policy favoring the finality of child-custody judgments, and making their modification more difficult. The policy evident in the commissioners' notes is also apparent in the provision of section 610(a) that '[n]o motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.' (Ill. Rev. Stat. 1977, ch. 40, par. 610(a).) The aversion to custody changes is further manifested by the requirement in section 610(b) that the custodian previously appointed shall be retained absent the conditions specified in section 610(b)(1), (2), or (3). By creating a

presumption in favor of the present custodian, the legislature has sought to promote a stability and continuity in the child's custodial and environmental relationships which is not to be lightly overturned."

In addressing any issue as to custody, section 602 of the Act (Ill. Rev. Stat. 1977, ch. 40, par. 602) requires that it be determined in accordance with the best interests of the child and that the court consider all relevant factors, including: (1) the wishes of the child's parent or parents as to his custody; (2) the wishes of the child as to his custodian; (3) the interaction and interrelationship of the child with his parent or parents, his sisters and brothers and any other person who may significantly affect the child's best interest; (4) the child's adjustment to his home, school and community; and (5) the mental and physical health of all individuals involved.

It has long been an established general rule that custody matters are within the discretion of the trial court because it is in the best position to hear and evaluate the evidence. We have stated previously that, given this discretion, a judgment of the trial court in custody matters will not be set aside unless it is shown that there was an abuse of discretion. (*Caulkins v. Caulkins* (1979), 68 Ill. App. 3d 284, 288, 385 N.E.2d 1117.) An abuse of discretion is shown when the judgment of the circuit court is found to be palpably erroneous, contrary to the manifest weight of the evidence, or manifestly unjust. (*Caulkins v. Caulkins*; *Savre v. Savre* (1978), 61 Ill. App. 3d 11, 377 N.E.2d 850; *Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 366 N.E.2d 87; *Wells v. Wells* (1976), 36 Ill. App. 3d 488, 344 N.E.2d 37.) While the general rule as to the trial court's discretion still applies, we must note that the heretofore broad discretion given the trial court in matters of custody modifications has been limited by the statutory provisions in the new Act (Ill. Rev. Stat. 1977, ch. 40, par. 610) and by the underlying intent of the legislature therein, as noted by our supreme court in the *Harne* case, to make modifications of custody more difficult. The supreme court, in the passage already quoted, speaks of an "aversion to custody changes" manifested in the new Act.

With these rules in mind, we must review the evidence before the circuit court in the instant case in order to determine whether the court abused its discretion in changing the custody of Sean Poston from his mother, with whom he had been living all his life, to his father. After careful scrutiny of the evidence, we conclude that the decision of the circuit court was against the manifest weight of the evidence and we reverse.

Although the order changing custody does not set forth findings with respect to the basis for that decision (see Ill. Rev. Stat. 1977, ch. 40, par. 610(b)), a matter to which we shall return later, the trial court's basis for

modifying custody is made clear in the record. In the transcripts from the hearings, the trial judge specifically states that it is his concern with "excessive punishment" and "excessive chores" that forms the basis for his order modifying custody as to Sean. It is apparent from the record that the trial court felt that the "excessive chores" given to Sean resulted in his poor performance in the fifth grade. We note, at the outset, that the trial court's decision was contrary to Sean's own stated preference, which was to remain with his mother and stepfather on the farm.

The testimony as to punishment indicated that Mr. Hofmann, Sean's stepfather, would discipline him usually with his hand across Sean's backside when Sean's farm chores were not done or were not done properly. On occasion, according to Sean's in-chambers testimony, his stepfather had spanked him using a stick or a belt. Sean testified that he gets along "so-so" with his stepfather. Sean reasoned that the basis for the spankings when they first moved in with his stepfather was because his stepfather was not used to having children around him. Sean testified that, on occasion, his stepfather struck him "pretty hard." Mark Poston, Sean's 14-year-old brother, testified that Mr. Hofmann hits them sometimes, but for good cause and usually with his hand across their "rump." According to Mark, who expressed a strong desire to stay with his mother and stepfather, such discipline was not done in anger but usually just to get them moving with their chores around the farm. Mark testified that Sean would sometimes cry as a result of the spankings, but he also stated that Sean confided to him that they didn't hurt that much.

Tamara Poston, who indicated her strong desire to live with her natural father, testified that her stepfather disciplined her with his hand and sometimes with a stick or a belt when she had not done her household chores. She testified that on one occasion, about a year before the hearing, his spanking with a belt left a bruise on her arm, apparently where she had reached back to break the blow of the belt. She testified that Sean got hit quite a lot for not having his chores done right. All the children testified in chambers. Mrs. Hofmann testified that her husband would sometimes discipline Sean by hitting him on the behind with his hand and that while in the past he occasionally would use a belt, he had not done so for over a year, since the incident in which Tamara received a bruised arm.

■■ While this evidence with regard to Mr. Hofmann's disciplining of the children indicates a rather strict approach to such matters, there is no indication in the record that the discipline administered caused serious physical or emotional harm to Sean or the other children. There was no testimony that Sean ever suffered any injury as a result of the discipline from his stepfather or that it was administered arbitrarily or without some

justification. We are unable to say, given all of the evidence in the record, that the punishment was anything outside the bounds of normal, albeit strict, parental discipline. The evidence, including that from the children themselves, indicates that they took the discipline in stride, although sometimes, understandably, with some complaint. The evidence presented, however viewed, was not of a character to establish a *serious danger* to Sean's physical, emotional, mental or moral health, and it is that statutory standard which is set forth in the Act as justifying a custody modification. We do not mean to denigrate the concern shown by the circuit court for Sean's welfare, but where the evidence in the record shows no real abuse of the children nor any serious harm to them from the punishment administered, then the requirement of serious dangers to their health has not been met.

The second asserted basis for the court's order modifying custody as to Sean was his failure in school. Yet, there is no solid connection established in the record between his poor performance in school and his home environment on the farm. The court felt that his chores around the farm prevented him from giving the time he needed to his fifth grade studies. Sean testified that his chores included getting the hay for the horses, corn for the cows and helping with watering the stock. Those chores were done immediately after school and usually took about an hour to an hour and a half. They were finished before supper. Both Mark and Mrs. Hofmann testified that Sean's chores, because of his age, are easier than Mark's. Sean does not have to do heavy work on the farm. Tamara has chores to do around the farm as does Mrs. Hofmann, the children's mother. The uncontradicted evidence indicated that Sean had plenty of time after his chores were done to attend to his school work. Mrs. Hofmann testified that Sean had done well in his school work in the fourth grade but that he was having problems in the fifth grade. Sean's own explanation for his poor performance was that he did not like his teacher and hated his principal. Sean testified that last year he liked his teacher. Mark testified that Sean doesn't try that hard with his school work. Sean's fifth grade teacher testified that he is doing poorly, but that he was no discipline problem and seems to be a good boy. She felt that the custody proceedings themselves may have contributed significantly to his performance. At a rehearing on his mother's petition to reconsider, after custody had been changed to his natural father, Sean testified that he liked his old school, which he attended while living with his mom and stepfather, a lot better than the one he was attending while living with his father. He also testified that he did not like his teacher at the school he attends when living with his father.

■■ The record, as noted previously, is insupportive of the trial court's

conclusion that there was a connection between his chores on the farm and Sean's showing in school. There is no indication that his chores tired him out so that he was unable to do the work assigned to him or that his chores left him no time to do school work. The uncontradicted testimony was to the contrary. It seems apparent that the boy's poor performance in the fifth grade, up until the time of the hearing, could be attributed to other factors besides his chores, including his relationship with his teacher and the principal and the pressure and disturbance caused by the custody proceedings. We are unable to find that the chores given to Sean on the farm in any way seriously endangered his physical, mental, emotional or moral health.

Having discussed the two primary bases for the circuit court's decision to change custody and finding them unsupported in the record, we now consider other factors bearing on the custody issue. The advantages to Sean of his life on the farm with his stepfather and mother are apparent in the record. Aside from the responsibility given him, commensurate with his age, for looking after some of the animals, there are also the more usual farm pleasures available to him. He has his own pony on the farm as well as other horses which can be ridden. He has his own cow every year, which he takes care of with help from his brother and stepfather, and which he shows at the annual 4-H fairs. Sean testified that he had almost $1,000 in his own bank account from the sale of livestock he had raised in the past two years. It was to these things that Sean himself referred when asked by the circuit court why he preferred to remain on the farm with his mom and stepfather. Sean stated he has friends with whom he plays and visits when living on the farm. He plays on an area little-league baseball team and enjoys the baseball a great deal. It is apparent he enjoys the company of his two young half-sisters when living on the farm.

Aside from the aforementioned advantages of life with his mother, from whom he had never been separated before, there is the fact of Sean's own stated preference. As noted by this court in *Savre v. Savre* (1978), 61 Ill. App. 3d 11, 13-14, 377 N.E.2d 850:

> "* * * the feelings of the child in custody matters should always be given serious consideration by the court. This is so particularly when the desire or preference of the children is based upon reasons related to their best welfare." (See *Caulkins v. Caulkins* (1979), 68 Ill. App. 3d 284, 385 N.E.2d 1117.)

Sean testified that he likes his stepfather but that he likes his own father more. However, when asked by the court with whom he would rather live, Sean clearly indicated that he would rather live on the farm with his mother, stepfather, brother and the two younger sisters. He indicated he

would miss his baseball, his friends, his sisters, his income from 4-H, and the farm animals if he would be required to live with his father. At the hearing on the petition for reconsideration, after Sean had been living with his natural father, he again stated that he preferred living with his mother and stepfather on the farm "quite a bit more" than with his father.

When with his father, they and Tamara live in a trailer without a yard. His father leaves for work in the morning 45 minutes before Sean leaves for school. Mr. Poston does fix Sean's breakfast for him before he leaves. Sean does not like his school which he attends while at his father's, and he misses the farm. That was his testimony at the hearing on the petition for reconsideration.

■■ In conclusion, when all of the evidence is examined, we conclude it does not support a finding that Sean's living with his mother and stepfather seriously endangered his physical, mental, emotional, or moral health. It was not established that his best interests were served by placing him with his father. There was an insufficient basis upon which to modify the then existing custodial arrangement. We believe that the circuit court overemphasized the seriousness of the parental discipline received by the children. We also believe that the court failed to give as much emphasis as was due to Sean's own desires and the advantages of the farm life in which he had been living. We also determine that the decision of the circuit court is contrary to the manifest weight of the evidence, which falls far short of the statutory standard justifying a custody change. Ill. Rev. Stat. 1977, ch. 40, par. 610(b)(3).

Although our stated decision reached disposes of the principal issue raised on appeal, some comment should be made as to the trial court's failure to include in its order findings as to its reasons for changing custody. Recently, the Illinois Supreme Court has addressed the issue presented as to the requirement for such findings when custody is modified. In *In re Custody of Harne* (1979), 77 Ill. 2d 414, the court determined that section 610(b) requires a trial court to make explicit findings that either subsection (1), (2), or (3) of section 610(b) is applicable in a case prior to modifying a custody judgment. No such findings were included in the trial court's written order modifying custody. Nor did the trial court, at the conclusion of the hearing, make the explicit findings required by the supreme court. However, as we noted previously, the bases for his order changing custody are apparent from an examination of the transcript of the hearing. The only issue was one as to subsection (3), whether Sean's present environment seriously endangered his physical, mental, emotional or moral health. The trial court obviously found that it did and that excessive punishment and excessive chores did present that danger to Sean. We find that there is insufficient support to require a change of custody contrary to the wishes of the child involved.

For the reasons stated, we direct that the order of the Circuit Court of Rock Island County changing the custody of Sean to the father be reversed and vacated.

Custody order reversed and vacated.

SCOTT and BARRY, JJ., concur.