*In re* MARRIAGE OF SYLVIA J. RAMER, Petitioner-Appellant, and KENNETH JOE RAMER, Respondent-Appellee.

Fifth District   No. 79-629

Opinion filed May 14, 1980.

Dennis J. Hogan, of Murphysboro, for appellant.

Joseph J. Neely, of Neely & Neely, of Metropolis, for appellee.

Mme JUSTICE SPOMER delivered the opinion of the court:

The petitioner, Sylvia Ramer, brought action for dissolution of her marriage to respondent, Kenneth Ramer. Petitioner sought custody of Kenneth Joe, the five-year-old son of the parties, who is their only child. Petitioner also has two teen-aged children from a prior marriage. The respondent also prayed for custody of Kenneth Joe. Following a bifurcated hearing, the trial court awarded the care, custody, control and education of Kenneth Joe to his father, subject to the right of reasonable visitation by his mother. From this custody order, the mother appeals. She

argues that the court failed to consider all relevant factors in determining custody, that the court failed to include a recitation of specific factors in the judgment order, and that the court abused its discretion in awarding custody to the father.

The testimony of the mother at the hearings indicated that she received $25 per week from her previous husband for support of a daughter, age 14, and a son, age 13. She testified that she was a licensed beautician, who operated her own shop in a house owned and occupied by her parents. She worked as a beautician about 1½ days per week, and also oversaw her parents' rental property. At the time of the dissolution of her marriage with Kenneth Ramer, she was 33 years old.

The mother testified that she and her husband would argue over how Kenny Joe was to be raised, especially with regard to tasks at home. She felt that her husband was too lax—that he provided no structure or responsibility for Kenny Joe. However, if she were granted custody, she had no objection to visitation rights, since she felt he was basically a good father.

The mother was very active in a woman's softball league. She was often out with friends at games, and they sometimes stayed out drinking afterwards until the early morning hours. On such occasions, if Mr. Ramer was working, she would leave her son with one or both of her parents, her older children, or a cousin, or sometimes she took all three children with her to ballgames, returning home after midnight. Drinking also occurred in the child's presence; on one occasion Mrs. Ramer entertained the ball team at her home and told them "[I]f they wanted to bring their own [intoxicants] I didn't care." On that particular night, she left with friends after the party, was gone a "couple of hours" and returned home after 2 a.m. Mr. Ramer did not participate in the drinking or the social events with his wife and her friends. However, she testified that between the dates of the first and second hearings she had changed her habits, limiting her nights out to once or twice a week. After the divorce, she planned to live with her parents until the custody case was settled, and then find another home. If she had to work full time, her parents would care for Kenny Joe.

Martha Wetherington was called as a witness on the mother's behalf. She testified that she worked as an apprentice in Mrs. Ramer's beauty shop. Throughout her employment, she noticed a good relationship between Mrs. Ramer and Kenny Joe.

The father, Kenneth Ramer, testified that his marriage to Sylvia Ramer had been his first. At the time of the dissolution, he was 31 years old. He worked at a plant from 3 p.m. to 11 p.m., but had requested and received a transfer to the 7 a.m. to 3 p.m. shift. He and his wife owned a

house in joint tenancy, and by agreement the house was to be available for him to reside in following the dissolution.

From the evidence presented at the hearings, it appeared that the father spent more time with Kenny Joe than did the mother. He testified that he spent most of his time at home with the child. He usually got the child up in the morning, fixed his breakfast, bathed him, and helped him dress. While Kenny Joe was presently in kindergarten and attended school only half days, when he reached the first grade the father would be able to return home from the day shift within 15 or 20 minutes of the child's return from school. The father testified that his brother and sister-in-law would care for Kenny Joe when he got out of school. He also testified that he took Kenny Joe with him to church and Sunday School, and that he went nowhere without his son except to work. When Mrs. Ramer was gone two or three days over a holiday weekend, Kenny Joe neither asked about her nor cried because of her absence, although he often cried if he had to go anywhere without his father. Mr. Ramer often observed his wife or her car at the tavern as he was coming home from work about 11:30 p.m. The respondent commented that his biggest fear if he lost custody was that his ex-wife would try to come between father and son, as in the past she had discouraged any relationship between her two oldest children and their father.

Several witnesses testified for the father. Rev. Jerry Holt, his minister, testified that there was a close relationship between father and son, and that Kenneth was a good father. He also noted that the two participated in all church activities together. Dennis and Helen Kaylor, neighbors who had known Kenneth Ramer for many years, also noted a close relationship. They also expressed their availability and willingness to help get Kenny Joe to and from school, and to care for him when necessary. Patricia Giltner, another neighbor, also testified about the father-son relationship: "I think it is extra close, I just think that it is an unusual relationship between him and his father and it is wonderful." Finally, Peggy Ramer, sister-in-law of Kenneth, testified that she and her husband were willing to assist with the child's care.

After taking the matter under advisement, the trial judge made the following verbal judgment:

"I think that the situation here deserved some brief comment by me on some aspects of this thing. I think that I should say that the use or non-use of alcoholic liquors per se is not a disqualifying thing on any parent and in like fashion the hours kept by any parent would not per se be a disqualifying factor. We have had a good bit about that here. Those things I think should be taken into consideration along with the entire aspect of the case when making

a decison by the Court and the effect of those things upon the child if any. I have given every consideration to the evidence offered here. We are mandated by the new Marriage Dissolution Act to consider certain elements and I have done so. That act too has mandated a greater equality in looking at the parents in these situations. In this situation I think that there is no question if the parties were reversed that custody would be given to the Mother, in addition I have attempted to consider the pluses and minuses for the child in the custody of either parent. It is my judgment that the best interest of the child would be served in this case with custody awarded to the father."

Section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 602) provides an outline of the relevant considerations for a determination of child custody:

"(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community; and

(5) the mental and physical health of all individuals involved.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child."

The record amply reveals that the trial judge thoroughly considered all of these factors in determining custody. The testimony of all witnesses, including the mother, emphasized the extremely close relationship between father and son. The father had a regular full-time job with which to provide security without significantly keeping father and son apart, while the mother's employment plans were uncertain. The father spent more time with his son than did the mother, who led an active social life which frequently excluded the child and required a variety of babysitters for him. The father would retain and live in the house owned by the couple, while the mother admitted she would soon have to find a new place to live. The child attended church functions regularly with the father, which would continue if the father received custody. Moreover, a strong system of support was promised by neighbors and relatives. Thus, the record reveals that the court thoroughly considered the interaction

and interrelationship of the child with his parents, as well as the child's adjustment to his home, school and community. Since both parents desired custody, and the child was only five years old and was not asked to express a preference, these factors are particularly significant.

Furthermore, these same factors reveal that the trial judge did not abuse his discretion in granting custody to the father. Such action was entirely consistent with the welfare and best interest of the child, which must be the sole objective of the court in making a custody determination. (*Patton v. Armstrong* (1974), 16 Ill. App. 3d 881, 882-83, 307 N.E.2d 178, 180.) Petitioner argues that since she was not found to be unfit, as the natural mother she had the right to custody. (*Miner v. Miner* (1849), 11 Ill. 43; *Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300.) The Illinois Supreme Court last had occasion to address this issue in 1968, when it reaffirmed the doctrine that maternal nurturing—and thus the maternal presumption—is in the child's best interest. (*People ex rel. Bukovich v. Bukovich* (1968), 39 Ill. 2d 76, 233 N.E.2d 382.) However, most appellate courts which have considered this question more recently have concluded that the presumption is no longer valid "as a result of on-going social and legal trends." (*In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 396 N.E.2d 1214, 1222; *Anagnostopoulos v. Anagnostopoulos* (1974), 22 Ill. App. 3d 479, 317 N.E.2d 681; *People ex rel. Irby v. Dubois* (1976), 41 Ill. App. 3d 609, 354 N.E.2d 562; *Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 320 N.E.2d 581.) Stated differently, the tender years doctrine has been deemphasized and applies, if at all, only where all things are equal between father and mother (*In re Custody of Melear* (1979), 76 Ill. App. 3d 706, 395 N.E.2d 208, 210), or it is simply one factor to be considered by the court in determining the best interest of the child. *Randolph v. Dean* (1975), 27 Ill. App. 3d 913, 917, 327 N.E.2d 473; *Strand v. Strand* (1976), 41 Ill. App. 3d 651, 657, 355 N.E.2d 47.

■ Petitioner's argument overlooks the fact that respondent made a positive showing in the case at bar that the welfare of the child will be better served by granting custody to him, rather than to petitioner. In short, equality did not exist between mother and father. Rather, the testimony revealed that the father had more contact with the child and could provide a more secure and stable environment. Moreover, the trial court, in commenting "In this situation I think that there is no question if the parties were reversed that custody would be given to the mother * * *" obviously did recognize the maternal presumption but found it was overcome by respondent's evidence.

Custody matters are within the sound discretion of the trial court, because it is in the best position to hear and evaluate the evidence. A judge has not abused his discretion unless his judgment is "palpably erroneous, contrary to the manifest weight of the evidence, or manifestly

unjust." (*In re Marriage of Poston* (1979), 77 Ill. App. 3d 689, 396 N.E.2d 576, 579.) There was no abuse of discretion here.

■ The petitioner also contends that the trial court erred in failing to recite the specific factors from section 602 upon which he relied in making his judgment. However, the judge specifically noted that he had considered the elements outlined by the Marriage and Dissolution of Marriage Act. What is more, the record revealed that the trial court heard testimony on, and thoroughly considered, all of the statutory factors listed; nothing else is required by section 602 of the Act. (*In re Custody of Melear* (1979), 76 Ill. App. 3d 708-09.) The case of *In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499, cited by appellant, is not in point, as that case did not involve an original custody hearing under section 602, as here, but a change of custody under section 610(b), which section specifically requires the court to make findings of fact as to which of the three prerequisites for modification is applicable.

■ We have carefully considered the situation of the child in this case. Although both parents appear to care for him and accept responsibility for his welfare, when matters of a stable, secure environment, and adjustment to school and home are considered, we believe the trial judge properly granted custody to the father with a view to what is in the best interest of the child. Based on this holding, the judgment of the trial court is affirmed.

Affirmed.

JONES, P. J., and KARNS, J., concur.