*In re* MARRIAGE OF CAROL LEE ECKERT, Petitioner-Appellant, and MARK WILLIAM ECKERT, Respondent-Appellee.

Fifth District   No. 5—85—0630

Opinion filed October 16, 1986.—Rehearing denied November 19, 1986.

WELCH, J., dissenting.

Phillip A. Montalvo, of Belleville, for appellant.

Steven E. Katzman, of Katzman & Associates, of Belleville, for appellee.

JUSTICE JONES delivered the opinion of the court:

Petitioner (mother) appeals an order of the trial court that denied her petition for leave to remove the parties' minor child from Illinois to Arizona.

Petitioner and respondent (father) were married on June 30, 1976, in Belleville. One child was born of the marriage, Matthew, age seven years at the time of the hearing on the instant petition. The parties' marriage was dissolved by a judgment of the circuit court of St. Clair County entered on December 18, 1983. The judgment awarded custody of Matthew (Matt hereafter, as he is referred to by the parties) to the mother with detailed and rather extensive rights of visitation specified for the father. The marriage was the second one for the mother. She had previously married a military serviceman who had been killed in action in Viet Nam. The mother had a son from her first marriage, Bernie Plassmeyer, age 15 and a high school sophomore at the time of the hearing. Bernie has a progressive type of asthmatic condition.

On May 23, 1985, the mother filed a petition for leave to remove Matt from the jurisdiction to Yuma, Arizona. The basis for removal was stated to be that the mother, a professor of nursing, had obtained employment in Yuma and that it would be in Matt's best interests to remain in her custody and be permitted to leave Illinois. The father filed his response to the petition in which he asserted that the mother's interest in moving to Yuma was for selfish reasons and not in the best interests of the child. The response further asserted that the proposed move would be detrimental to the mental health and welfare of the child and would irrevocably injure the parent-child relationship between father and son. At the same time that the father's response to the petition was filed, the father also filed a petition to modify the judgment of dissolution of marriage by awarding him the custody of Matt. The father's petition to obtain custody is not involved in this appeal.

A hearing was held on the petition and response, and the issue was sharply contested. We need not set forth in any detail the evi-

dence adduced. Although each party made some attempt to disparage the custody circumstances of the other, it can be said that the record shows both the mother and father to be excellent, loving parents who are dedicated to the proper nurture and upbringing of their son. In fact, both mother and father may be said to be exceptional in their concern that Matt receive proper care and attention. In this regard Matt is obviously more fortunate than most children of broken families. The father is assiduous in the exercise of his rights of visitation with Matt and regularly takes him to interesting events and activities. It is obvious, too, that Matt has developed a real attachment to his father as well as to his mother. The natural consequence of the parental concern and affection displayed by both parents is that Matt is an especially well adjusted and happy child.

The court appointed a psychologist to examine the three family members for the purpose of determining what impact a move to Yuma might have on Matt. His report to the court could be regarded as neutral, but it concluded with a recommendation that Matt remain in the St. Clair County area so as to be better able to keep in contact with his extended family and maintain his frequent contacts with his father. The psychologist's report is silent as to any effects upon Matt if he were to remain in Belleville while his mother is in Yuma.

The trial court made extensive findings in its order denying petitioner the right to remove Matt to Yuma. Such findings concluded with: "A move to Yuma (disregarding the effect of a diminishment of visitation and contacts with the minor's extended family) would be neutral. *** When this exceptional relationship [between Matt and his father], in a nurturing environment, is viewed against a neutral effect of a move to Yuma, the child's best interests are favored by a continuation of the present situation."

Section 609 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat., 1984 Supp., ch. 40, par. 609), states:

> "The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal. When such removal is permitted, the court may require the party removing such child or children from Illinois to give reasonable security guaranteeing the return of such children."

Petitioner contends that she has met the statutorily imposed burden of proof that the move to Yuma would be in the best interests of Matt

and that the finding of the trial court to the contrary was against the manifest weight of the evidence. We agree and reverse the order of the trial court.

■■ This court recently considered section 609 of the Illinois Marriage and Dissolution of Marriage Act in the case of *In re Marriage of Lichtenstein* (1986), 139 Ill. App. 3d 881. There the trial court had granted the mother the right to remove two minor children from the jurisdiction to Germany. On appeal by the father, we affirmed the trial court. While noting that a petitioner has the burden of proof that removal is in the best interests of minor children, we said, in accord with *In re Marriage of Brady* (1983), 115 Ill. App. 3d 521, 450 N.E.2d 985:

> "[A] *prima facie* case is presented when the petitioner shows a sensible reason for the move and makes a showing that the move is consistent with the child's best interests. Because a child usually receives little, if any demonstrable benefit from moving, a direct benefit need not be shown." (*In re Marriage of Lichtenstein* (1986), 139 Ill. App. 3d 881, 887.)

Admittedly, the *Lichtenstein* case differs from this in that in *Lichtenstein* the trial court had found the move to Germany in the best interests of the child, whereas in this case the trial court found the move to Yuma was not in Matt's best interests. However, this distinction is not a telling one, for, irrespective of whether the trial court grants the right to remove or refuses it, the prime considerations remain the best interests of the child and the burden of proof to be borne as a prerequisite to permission to remove. Consideration on appeal of an order upon a petition to remove turns upon whether the decision of the trial court is against the manifest weight of the evidence. *Gallagher v. Gallagher* (1978), 60 Ill. App. 3d 26, 376 N.E.2d 279.

It was demonstrated in *In re Marriage of Brady* (1983), 115 Ill. App. 3d 521, 450 N.E.2d 985, that case law interpretation of section 609 concerning the burden of proof to be borne by one seeking the removal of a minor child was not changed by the July 1, 1982, amendment that expressly placed that burden upon a petitioner. Accordingly, cases predating that amendment remain authoritative, as was noted in *Brady*. Our reading of the cases that have considered section 609 decided both prior and subsequent to the July 1, 1982, amendment points to a somewhat liberalized but nevertheless realistic approach to a nettlesome problem: under what circumstances should courts permit removal of minor children from the jurisdiction and under what circumstances refuse it. The indicated trend is decidedly to permit removal unless rather strong negative circumstances militate

against it. The trend in the cases we note has been established within the context of the consideration of the best interests of the minor children involved. Policy considerations are obviously important. Custodial parents frequently must move to other States or countries in order to pursue opportunities for improvement. Our free society is loath to condemn or restrict one in his or her endeavors to improve one's lot in life, or, for that matter, to decide simply to go elsewhere. Certainly ours is a fluid society and a move from one State to another gathers little comment. However, complications arise when minor children of dissolved marriages are involved. The law grants rights to noncustodial parents to continue to share in the nurture, love and enjoyment of the minor children. Removal of the children from the jurisdiction means that the rights of the noncustodial parent may have to give way to some extent to the desires of the custodial parent. The stress thus created is not easily resolved and certainly cannot yield to the application of a formula. Each case is different, of course. Many factors are to be considered as they touch upon the best interests of the children.

As we have stated, we detect a liberal approach in the cases, an apparent willingness to permit removal unless negative factors dictate otherwise. Dilution of rights of visitation have not constituted such negative factors that will prohibit removal.

In *In re Marriage of Burgham* (1980), 86 Ill. App. 3d 341, 408 N.E.2d 37, the mother was given custody of three minor children and later decided upon a move to California. The mother had a job there, and the circumstances of housing and school for the children were adequate. By the mother's admission, she would neither gain nor lose financially by the move. The father objected to the move because his visitation rights would suffer and because of the mother's relations with a boyfriend in California. The mother admitted that her move was influenced by the moving of her boyfriend from Illinois to California. In deciding that the mother should be permitted to remove the children to California, the trial court utilized the "best interests of the children" standard. The court in *Burgham* used the following quotation from *Tandy v. Tandy* (1976), 42 Ill. App. 3d 87, 90, 355 N.E.2d 585, where a mother had been granted the right to remove a minor child to California upon a showing of improved health for herself and the child and the only detriment to the father was increased difficulty of visitation:

> " 'In two recent cases this court has held that where one of the parents has been awarded custody of the parties' child and there is no showing that the award was against the child's best

interests, a court should not oppose removal of the child from Illinois where the parent granted custody has moved or desires to move to another jurisdiction unless there is a specific showing that the move would be against the child's best interests. (*Garland v. Garland* [(1974)], 19 Ill. App. 3d 951, 312 N.E.2d 811; *Spencer v. Spencer* [(1971)], 132 Ill. App. 2d 740, 270 N.E.2d 72.) The holdings in these cases reflect that it is generally in a child's best interest to remain with the parent in whose custody the court has determined to place it.' 42 Ill. App. 3d 87, 90, 355 N.E.2d 585, 587." *In re Marriage of Burgham* [(1980)], 86 Ill. App. 3d 341, 345, 408 N.E.2d 37, 40.

The court in *Burgham* noted that the above-quoted language had been approved in *Gallagher v. Gallagher* (1978), 60 Ill. App. 3d 26, 376 N.E.2d 279, and *Gray v. Gray* (1978), 57 Ill. App. 3d 1, 372 N.E.2d 909. In the *Gray* case, the trial court had denied permission to remove a minor child to California, where the mother had obtained employment. The appellate court reversed, although the child had expressed a desire to remain in Chicago and the father's visitation rights would be impaired. We believe the following from *In re Marriage of Burgham* (1980), 86 Ill. App. 3d 341, 345-46, 408 N.E.2d 37, 40, as it viewed the *Gray* case, to be an accurate statement of the law:

"We agree with the position of the *Gray* court that the best interests of a child subject to a custody decree are usually served by leaving the child with the existing custodial parent. Language in *Tandy, Garland,* and *Spencer* all ties the desires of a proper custodial parent to the best interests of the child indicating that permitting the spouse to remove the child may indirectly benefit the child by enabling that spouse to remain as custodian. It also seems that, other things being equal, granting such a request would likely indirectly benefit the child by making the custodian a happier, better adjusted parent than would be the case if the custodian's freedom of movement was more restrained.

After considering the foregoing precedent, we deem the following to be the proper rule for a trial court to follow in ruling on a petition of a custodial spouse to remove a child from the State. As stated in *Gallagher, Quirin,* and *Garland,* the petitioning spouse has the burden of proof. However, a prima facie showing is made when a proper custodian states a desire to remove, shows a sensible reason for the move, and makes at least a superficial showing that the move is consistent with the

child's best interests. As a child often receives little, if any, demonstrable benefit from moving, direct benefit need not be shown. A different rule would unnecessarily tie many custodial spouses to this State. As proof that the child would not be harmed by the move involves proof of a negative, the petitioning spouse need not negate all possibilities of harm to the child. An objecting party could, of course, introduce evidence of specific damage likely to be incurred by the child. If the noncustodial spouse has rights of visitation, the trial court must give consideration to these rights and, with rare exceptions, should not allow removal if it would prevent reasonable visitation by the noncustodial spouse. The trial court must then weigh all of these items of evidence in arriving at its conclusion."

The case under consideration is very close on its facts to *Garland v. Garland* (1974), 19 Ill. App. 3d 951, 312 N.E.2d 811. There the mother-custodian was a teacher at Northwestern, as was her fiance. Her fiance obtained a position in Oxford, Mississippi, and the mother was assured that she also could get employment there. The two planned to move to Oxford and to marry when they got there. The mother sought the right to remove her two minor children. At the hearing the father called as a witness a psychiatrist who gave testimony strongly favorable to the father. In affirming an order permitting removal, the court stated that "although [the psychiatrist had] testified that the separation of the children from the father would be more traumatic than to most children because of their apparent closeness, we believe that the evidence indicates both were good parents and, under such circumstances, a separation from either would be traumatic." *Garland v. Garland* (1974), 19 Ill. App. 3d 951, 956, 312 N.E.2d 811, 815.

■ The facts and the result of the *Garland* case set the tone for our result here. Furthermore, all of the cases cited above strongly indicate that the right to remove should be granted in this case. The rule to be followed in ruling on a petition to remove pursuant to section 609, as set forth in the *Burgham* case, is a reasonable and proper one. In testing the facts of this case against the rule, we can only conclude that the finding of the trial court was against the manifest weight of the evidence and that the best interests of Matt will be served by permitting his removal to Yuma with his mother. The mother, a registered nurse with an M.S. degree in cardiovascular nursing and a practicum in administration, testified to what she believed to be an advancement of her career, although the financial im-

provement does not appear to be significant. Her position in Yuma would be as a teacher in a junior college. Her two sons, who had a strong attachment to each other, would remain together. Health conditions for her son, Bernie, afflicted with asthma, would improve, although evidence of this may be regarded as largely inferred. The mother had been dating a physician in Yuma with some talk, but no present plans, of marriage. Although the trial court termed the move to Yuma as "neutral" with regard to Matt's best interests, we must respectfully disagree. We also note that the only detriment the father managed to establish was the diminution of visitation with Matt, a matter of importance, certainly, but, as we have noted, not controlling.

The father has placed reliance upon the case of *Quirin v. Quirin* (1977), 50 Ill. App. 3d 785, 365 N.E.2d 226, decided by this court. In *Quirin* we reversed the decision of the trial court to permit removal of minor children to Arkansas. We believe that upon its facts the *Quirin* case was properly decided and would be decided in the same manner today. It is distinguished by facts that established a decided detriment to the children if removal had been permitted.

We would comment that the attachment of the father to the son and the son to the father, well fixed as it is, will probably not be diminished. Although visitation will be more difficult, it is not impossible. To fix and determine the rights of visitation under the new circumstances, this case must be remanded to the trial court. Accordingly, the order of the trial court is reversed and the cause remanded with directions to enter an order granting petitioner the right to remove Matt to Yuma, Arizona, and to make provision for visitation by the father.

Reversed and remanded with directions.

KARNS, J., concurs.

JUSTICE WELCH, dissenting:

I respectfully dissent. In a case concerning custody of children of tender years, the trial judge sees how mother, father and child testify as well as what they say; even when they are not testifying, parents and child demonstrate to the judge how they act, react, and interact. It is no surprise then, that this court defers when it can to the individual judge responsible for each case: "The trial judge was able to observe the parties and hear their testimony, and to talk with the children. It has been generally held that this observation is a vital factor

in the determination, and that the reviewing court should not disturb the findings unless they are palpably against the manifest weight of the evidence." (*Corcoran v. Corcoran* (1967), 79 Ill. App. 2d 328, 333, 224 N.E.2d 611, 613-14.) "Custody matters are within the sound discretion of the trial court, because it is in the best position to hear and evaluate the evidence." (*In re Marriage of Ramer* (1980), 84 Ill. App. 3d 213, 217, 405 N.E.2d 401, 404.) "[T]he trial judge had the best opportunity to observe the parties and their conduct and demeanor while testifying. This is a vital factor in evaluating the correctness of his determination." (*Kokotekian v. Kokotekian* (1959), 23 Ill. App. 2d 171, 173, 161 N.E.2d 712, 713.) "The trier of fact had significant opportunity to observe both parents and the child and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities. We should not disturb the determination of the trial court unless it has resulted in manifest injustice or is against the manifest weight of the evidence. The presumption in favor of the result reached by the trial court is always strong and compelling in this type of case." *Gallagher v. Gallagher* (1978), 60 Ill. App. 3d 26, 31-32, 376 N.E.2d 279, 283-84.

While the majority opinion in this case sets forth the controlling principles of law in a removal case, I believe the facts of this case strongly support the result reached by the trial judge. Respondent's evidence, if believed (and the trial judge apparently believed it), showed (1) respondent is a model parent; (2) petitioner has substantially interfered, and likely will continue to interfere, with court-ordered visitation as well as the natural right of association between parent and child, and (3) the intended move to Yuma is a ruse intended to distance petitioner and her sons from respondent and his family and place her in a closer proximity to her Yuma physician friend.

Regarding respondent's record as a parent, the court-appointed psychologist who interviewed parents and child in this case was Dr. Daniel J. Cuneo, who frequently serves the St. Clair County circuit court in that capacity, and he is well known to this court. Presumably he is aware of the phenomenon of overcompensation by a post-divorce parent, behavior which petitioner argues respondent is guilty of here in an attempt to "give him a Santa Claus image." Dr. Cuneo's final report mentions petitioner's accusations in that regard. Nonetheless, Dr. Cuneo writes: "Mr. Eckert has an excellent relationship with his son, one of the best I've seen. He is involved in all aspects of his son's life. As the result of Mr. Eckert's love, concern, and time spent with his son, Matt has an excellent relationshhip [*sic*] with his father. This

relationship has been very beneficial to Matt. It has been one of the contributing factors to Matt's well adjustment."

Several witnesses testified regarding respondent's unusual attributes as a father. Sister Mary Simpson, an experienced teacher and counselor, called respondent a loving and concerned father. She testified that in her opinion uprooting a child between the ages of 6 and 12 was particularly traumatic, "and that's an understood fact by anyone who has studied child psychology." This witness took exception to describing respondent as a "Santa Claus" father, testifying respondent provided a steadying influence on Matt "because he's not only the type of father as I have seen who gives him a good time, but as also the type of father who would take him wherever he goes whatever he's involved in that particular day. In other words, it isn't all fun and games." She testified that the "father image" was important to Matt, and that "when he sees [respondent], he sems to be really happy and really shows his love on his face."

Rich Rujawitz, an assistant fire chief in Belleville, testified regarding respondent's hospice work with Rujawitz' son Brad, who was terminally ill with cancer. According to Rujawitz, respondent "did more than we ever thought anybody could do. He was there all the time; he took Brad several places, just him and Brad, getting him away from mom and dad and he was a true friend to my boy and to the family. He helped all of us." Rujawitz testified that respondent sometimes brought Matt along, and that Matt and respondent "were very close."

William Corbin testified he knew respondent from Cub Scouts, where respondent was Cubmaster, and now from Boy Scouts, where respondent was Scoutmaster. According to Corbin, he had been with respondent and Matthew on numerous "camp-outs"; Matt also came to scout meetings and played with other children his age who came with their fathers and were brothers of scouts. Corbin testified respondent cancelled his other activities "be it scouting or whatever so he can have Matthew." Corbin testified that in his opinion Matt and respondent "get along fantastically well," that respondent is a "wonderful" father, and that he had witnessed Matt's reluctance to leave his father. According to Corbin, a father figure is very important for a young man, "especially when they are seemingly as close as Mark and Matt are."

Lloyd Roitstein, executive director of the Okaw Valley Council, Boy Scouts of America, testified he had known respondent a year and a half. According to Roitstein, respondent had distinguished himself as a volunteer leader in that he was "very active" and would "go that extra mile to help anybody." According to Roitstein, "you can just see

[Matt's] eyes, he's proud of his father and what his father does and the awards he's received; he enjoys being with him." Roitstein testified respondent had received the Georgy Meany Award for volunteer service to the community, had received a special district award as a top Boy Scout leader, and had been cited by the Jaycees as one of the top 10 young people in the community for his school and scouting involvement. (Later, when respondent was asked what awards he had received, petitioner's counsel offered to stipulate respondent was a "very outstanding citizen.")

Respondent is employed as a funeral home attendant, ambulance driver, and emergency medical technician. He gets hours and days off on a rotating basis. He testified his schedule was an asset because he could do things with Matt at school or in daytime. According to the judgment of dissolution filed December 8, 1983, his visitation rights are as follows: 10 a.m. to 8 p.m. on respondent's days off work during Matt's summer vacation; 4 p.m. to 8 p.m. on respondent's days off during the school year; when respondent has a three-day weekend off including a Friday during the school year, visitation from 4 p.m. Friday to 8 p.m. Sunday; when respondent has a three-day weekend off including a Monday during the school year, visitation from 10 a.m. Saturday to 8 p.m. Sunday, plus 4 p.m. to 8 p.m. Monday; during school summer vacation, when respondent has a three-day weekend off including Friday, visitation from 10 a.m. Friday to 8 p.m. Sunday; during summer vacation when respondent has a three-day weekend off including Monday, visitation from 10 a.m. Friday to 8 p.m. Monday; during 1984, two weeks of uninterrupted visitation coinciding with respondent's vacation; three weeks uninterrupted summer visitation in 1985; an additional uninterrupted week during summer when Matt reaches high school; plus specified alternating holiday visitation. Petitioner, her son Bernie, and respondent agreed respondent had never missed a visitation. Respondent testified he has taken Matt to Catholic mass when visitation was on Sunday, though respondent was Protestant. (Petitioner is Catholic.)

The trial court interviewed Matt at length in chambers. Matt expressed a definite preference to remain in Illinois. Asked whether his dad's girlfriend ever stayed over at night when Matt was there, Matt said no. Asked what the sleeping arrangements were when they went to Arizona, Matt said his mom stayed with Lester and he stayed with Bernie. Asked whether his parents got along well, Matt said no. Matt said his father said "good things" about his mother, and his mother didn't talk much about his father.

There was considerable testimony, much of it conflicting, on the

subject of whether petitioner reasonably cooperated with respondent in matters pertaining to visitation. Respondent testified he would never have "settled" the dissolution proceeding if he had foreseen the lack of cooperation, or that petitioner would try to move away. Respondent testified petitioner did not allow him to speak with Matt on the phone. According to respondent direct communication on visitation had broken down, and now when he picked up Matt it was arranged through the respective attorneys; on one occasion, a letter from his attorney confirming the usual visitation times contained a typing error regarding pickup time; the attorneys spoke by phone, acknowledged the error, and confirmed the usual time, but when respondent arrived to pick up Matt, no one was home. He found them at a shopping mall. According to respondent, petitioner was "sarcastic" about the matter: "Carol yanked on Matthew and pulled him back and said, 'You don't have him until 4:00 p.m. Your lawyer typed the letter wrong.' "

Respondent also testified he often saw Matt with petitioner in public and that on these occasions petitioner would "yank" Matt away and prevent their speaking together. Respondent was further examined and testified:

"Q. *** [W]hen you return Matt from visitation, when you give him back to Carol, what if anything does she do—has she done?

A. Carol repeatedly is very—I guess the word is almost nasty when Matthew comes into the yard.

Q. Obviously it's directed at you, not Matthew?

A. It's obviously [*sic*] she's upset with me but she takes it out on Matthew.

Q. How does she do that?

A. As I approach the door, the door comes open and she grabs Matthew and if I'm giving him a hug or kiss, which I don't think is anything out of the ordinary, she'll grab him and yank him in the house and he'll be crying on many instances and say, 'Mom, I want to talk to dad; mom, I want to give dad a kiss.' She says, 'Get in here in the door.' and I'll say, 'Carol, I want to talk to you about next Wednesday' and the door slams in my face. I never have a chance to communicate anything."

Fifteen-year-old Kevin Goalby was examined and testified:

"A. [W]hen I've been along when he [respondent] takes him [Matt] home, they'll be outside of his ex-wife's house and Matt will give him a big hug and he tries to stay out there as long as he can before his mom comes out and takes him in the house.

Q. *** How often have you been with Mark when he has taken Matt home?

A. I'd say about six or seven times.

Q. And what have you observed what Mrs. Eckert or Carol Eckert has done, if anything, when Matt has come home?

A. She's come out and she's grabbed him—almost brutally grabbed him and tugged him into the house and just slammed the door."

Karen Niemann testified she babysat Matt weekly during the summer of 1982 and to some extent since; Matt, then age four, tried to phone his paternal grandmother (who lived a few blocks away) each time he was in the witness' charge; petitioner told the witness not to let him make the calls; the witness was uncomfortable being "in the middle" and quit.

Annie Mae Banes, one of Matt's first-grade teachers, testified her classes went on apple-picking trips and that parents were allowed to come along. According to Banes, she gave respondent permission to go, not knowing the family situation; when she found out, she told petitioner she could go next time. Banes testified petitioner told her "she was going to keep him [Matt] home and he was going to be sick."

Shirley Eckert, respondent's mother, testified: "Well, I've seen many times—my son gets out of the car and he tells him goodbye and he doesn't even have a chance to get up to the door. The door flies open, Carol rips out, grabs him by the arm and you can hear many times, 'Get in the house.' " In chambers, Matt stated he was *not* allowed to phone his father and did not know why.

I find the above testimony believable, and it apparently was believed by the trial judge. This was substantial proof that respondent is an exemplary parent and that visitation will be substantially interfered with should removal be allowed. This alone is sufficient to require that the order denying removal for the good of the child be affirmed. However, there was more. Petitioner admitted there are no direct flights from St. Louis to Yuma and that Matt is too young to transfer planes at Phoenix or elsewhere. Thus, any visit arrangements from Yuma are at her mercy, which the evidence above shows may well be withheld. She testified she thought one or two visits a year with respondent would be enough. Also, the evidence shows petitioner's stated reasons for moving to Yuma to be insufficient or false and that the move will be "neutral" at best for her as well as the child. Most of petitioner's family, and respondent's, live in the Belleville area, including all three of Matt's surviving grandparents. Petitioner

admits she has not inquired at all as to whether a better job than the one she has now can be had in the St. Louis area. She admits she and her boyfriend have only "talked" of marriage.

In the order denying permission to remove, the trial court concluded petitioner had not sought employment in the St. Louis area; there was no evidence regarding how the move to Yuma would affect Bernie's asthma; petitioner was not engaged, nor had a wedding date been set; respondent had "an *exceptionally* good relationship with his son and spends a great deal of quality time with him" [emphasis in original]; a good relationship with his father is important at Matt's age; the move would substantially diminish their time together and frequency of contacts; petitioner's opposition to extended summer visitation, if allowed, would further reduce their time together; presumably expenses would prohibit more than an occasional visit; petitioner would not benefit financially from the move; she is financially secure now; her prospects of marriage are speculative; petitioner did not intend to leave Illinois without Matt; and, finally, balancing the "exceptional relationship" of father and son against the "neutral effect" of the move to Yuma, that "the child's interests are favored by a continuation of the present situation." The record overwhelmingly supports the findings and conclusions of the trial court.

A remarkably similar case in which this court affirmed denial of permission to remove is *In re Custody of Anderson* (1986), 145 Ill. App. 3d 746. The facts in favor of denying removal in the instant case are at least as strong as those in *Anderson*. In *Anderson*, as here, the move in question was to Arizona, effectively separating the children from the father. There, as here, the mother portrayed her job change as a professional advancement but could not show her new job would be better paying than her present one and had not looked for work near her present home. In *Anderson*, unlike the case at bar, the father presented no witnesses in support of his own character; the *Anderson* court noted no evidence such as we have that the custodial parent would be uncooperative with visitation; the father in *Anderson* was on the record no better than the model father in the case at bar. The *Anderson* court affirmed the trial court's denial of permission to remove "[i]n light of the uncertainty of petitioner's Arizona employment, the fact that petitioner might well be able to find similar employment in the Chicagoland area, and the fact that removal would severely intrude upon respondent's joint custody rights." In my opinion the *Anderson* court reached its decision by proper respect for the standards set by the legislature and the decision of the trial court.

Under the majority's decision in this case, the matter will be re-

manded with instructions to allow removal to Yuma and to fix appropriate visitation. The most time the trial court can give respondent and Matt together is all of summer school vacation, plus a Christmas holiday visit, and this only assuming petitioner's cooperation with visitation. As the trial court implies in the order appealed from, this is much less than the child has now, and it is not enough time for a growing boy to be with his father, especially as fine a father as this one. Hopefully on remand the court will expressly warn petitioner of the penal consequences of violating the provisions of visitation. See *Voss v. Voss* (1974), 23 Ill. App. 3d 312, 316, 319 N.E.2d 72, 76.

The trial court's authority to deny permission to remove the child is implicit in section 609 of the Act, cited by the majority. The majority does not conclude the trial court misunderstood the law. We may not overturn a judgment merely because we might disagree with it or think we would have come to a different conclusion had we been the trier of facts. (*Schulenberg. v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624, 626.) I respectfully insist that it is our duty to affirm the order appealed in this case.